**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 95-40071
_____

UNITED STATES OF AMERICA,

Appellant,

VERSUS

DONALD RAY COLEMAN,

Appellee.

_____

Appeal from the United States District Court
for the Eastern District of Texas
_____

March 5, 1996

Before JOLLY, DAVIS, and DENNIS, Circuit Judges.

DAVIS, Circuit Judge:

Donald Ray Coleman was convicted by a jury on three counts: one count of carjacking in violation of 18 U.S.C. § 2119 and two counts of using and possessing firearms in violation of 18 U.S.C. § 924(c)(1). Coleman makes two arguments on appeal: (1) the district court erred in admitting evidence of other carjacking attempts; and (2) the enactment of 18 U.S.C. § 2119 was not a valid exercise of congressional power under the Commerce Clause. We find no merit in either argument and affirm the district court.

I.

On April 19, 1994, a yellow Mercedes Benz belonging to Mr. and Mrs. John E. Luttig was carjacked from their driveway in Tyler, Texas. The carjacking occurred at approximately 11:00 p.m. as they

were exiting the vehicle following a trip to Dallas.  During the carjacking, Mr. Luttig was shot and killed.

Earlier on April 19, 1994, around 5:00 p.m., Donald Ray Coleman ("Coleman"), his brother Cedrick Demond Coleman ("Cedrick"), and Napoleon Beasley ("Beasley") drove from their hometown of Grapeland, Texas, to Corsicana, Texas, a distance of 78 miles.  Beasley was driving his mother's Ford Probe.

Coleman later told investigators that, on the way to Corsicana, Beasley discussed models of cars he would like to carjack.  The trio stopped in a Walmart parking lot in Corsicana and spotted a Lexus automobile which they followed for about 71 miles to Tyler, Texas.  According to Coleman, Cedrick started driving on the way to Tyler.  Beasley rode in the front passenger seat holding a .45 caliber pistol and Coleman was in the back seat with a sawed-off shotgun.  After losing the Lexus, they pulled into the parking lot of the El Chico restaurant in Tyler where they attempted to carjack a parked Mercedes Benz.  Coleman believed the attempt was unsuccessful because the driver of the Mercedes retreated into the restaurant when he saw Beasley get out of the car, cocking his gun.

The trio left the parking lot headed for Grapeland, but turned around after deciding to carjack a vehicle in Tyler.  At a red light, they spotted the Luttigs in their yellow Mercedes Benz. They followed the Mercedes into a residential neighborhood where the Luttigs pulled up a driveway into a garage.  Cedrick drove the Ford Probe past the house.  Beasley, carrying the pistol, ran up the driveway.  Coleman followed with the shotgun.  Beasley shot Mr.

2

Luttig in the head, fired at Mrs. Luttig, and then shot Mr. Luttig again. Mr. Luttig died as a result of the second gunshot to his head. Beasley then took Mr. Luttig's keys and entered the Mercedes Benz on the driver's side. Coleman stepped over Mrs. Luttig, who was lying face down on the garage floor, removed her foot from the car, and entered the car on the passenger's side.

While backing out of the driveway, Beasley ran into a landscape retaining wall, damaging the Mercedes. Beasley continued driving away from the Luttig's home with Cedrick following in the Ford Probe. He eventually abandoned the Mercedes not far from the Luttig's home. Cedrick, Coleman and Beasley returned to Grapeland, approximately 80 miles from Tyler.

Based on a Crimestoppers tip, the Federal Bureau of Investigation and local law enforcement officials began an investigation in Grapeland and questioned Cedrick and Coleman. After initially denying involvement, Coleman gave a recorded statement when he learned Cedrick was cooperating with the officers. Coleman was placed under arrest and transported to Tyler, Texas, where he gave a second recorded statement after officers learned that his first statement had not been completely truthful.

Coleman and Cedrick were charged by indictment with one count of carjacking in violation of the Anti-Car Theft Act of 1992, 18 U.S.C. § 2119, and two counts of using or carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1). The brothers were tried separately. Coleman was found guilty by a jury of all three counts. The district court sentenced him to a total

term of imprisonment of 525 months.  Coleman filed a timely notice appealing his conviction but not his sentence.

## II.

### A.

Coleman first argues that he is entitled to a new trial because the district court erred in admitting evidence of Coleman, Cedrick, and Beasley's efforts to follow the Lexus and to carjack the Mercedes in the El Chico parking lot.  Evidence of these "other acts" was admitted solely through Coleman's videotaped statements.  Coleman argues that this extrinsic evidence was inadmissible under Fed. R. Evid. 404(b) and that the government failed to prove he committed these acts.  The government argues that this evidence is intrinsic and not subject to Rule 404(b).

The evidentiary rulings of a district court with respect to intrinsic or extrinsic evidence are reviewed under an abuse of discretion standard.  United States v. Dillman, 15 F.3d 384, 391 (5th Cir.), cert. denied, 115 S.Ct. 183 (1994).  Even if we find that the district court abused its discretion, the error is not reversible unless the defendant was prejudiced.  Id.

To determine whether "other acts" evidence was erroneously admitted, first we must determine whether the evidence was intrinsic or extrinsic.  "'Other act' evidence is 'intrinsic' when the evidence of the other act and evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged."  United States v. Williams, 900 F.2d 823,

4

825 (5th Cir. 1990). This evidence is admissible to complete the story of the crime by proving the immediate context of events in time and place. United States v. Kloock, 652 F.2d 492, 494-95 (5th Cir. 1981); see also, United States v. Royal, 972 F.2d 643, 647 (5th Cir. 1992), cert. denied, 507 U.S. 911, 113 S.Ct. 1258 (1993) (intrinsic evidence admissible so the jury may evaluate all the circumstances under which the defendant acted). Intrinsic evidence does not implicate Rule 404(b), and "consideration of its admissibility pursuant to Rule 404(b) is unnecessary." United States v. Garcia, 27 F.3d 1009, 1014 (5th Cir.), cert. denied, 115 S.Ct. 531 (1994).

In the instant case, Coleman contends that he simply followed Beasley up the driveway to see what would happen. Evidence that Coleman, Cedrick, and Beasley followed the Lexus and attempted to carjack a Mercedes at the El Chico helped place the entire events of the evening in context and tended to negate Coleman's assertion that he did not know what Beasley planned to do. Placing the events of the evening in context assisted the government in establishing the elements of the charged crimes: aiding and abetting, carjacking, and use and possession of a firearm during a crime of violence.[1] The government had to prove that Coleman

---

[1]The elements of these three crimes were stated in United States v. Harris, 25 F.3d 1275, 1278 (5th Cir.), cert. denied, 115 S.Ct. 458 (1994):

> In order to convict defendants of carjacking in violation of 18 U.S.C. § 2119, the government must prove that: the defendant, (1) while possessing a firearm, (2) took from the person or presence of another (3) by force and violence or intimidation (4) a motor vehicle which had moved in interstate or foreign commerce. In order to convict defendants of using a

5

knowingly possessed a firearm during the carjacking at the Luttig home, the extent of his participation in the carjacking, and his intent to make the carjacking succeed. Coleman's narrative about the earlier efforts to carjack the Lexus and the Mercedes was probative and helpful to the jury in evaluating these issues. This evidence was particularly helpful in evaluating Coleman's opportunity to use the weapon and his knowledge of Beasley's intent to use a weapon to carjack an automobile, and in generally placing Coleman's conduct regarding the charged offenses in proper context. Thus, the district court did not err in admitting this intrinsic evidence.

B.

Coleman argues next that 18 U.S.C. § 2119 is not a valid exercise of congressional power under the Commerce Clause in light of <u>United States v. Lopez</u>, 115 S.Ct. 1624 (1995).

In <u>Lopez</u>, the Supreme Court invalidated, as beyond the powers of Congress under the Commerce Clause, the Gun-Free School Zones Act which made it a federal offense to possess a firearm within 1000 feet of a school. <u>Id.</u> at 1629.

The Supreme Court identified three categories of activity that Congress may regulate under the Commerce Clause. "First, Congress

---

> firearm in the commission of a crime of violence in violation of 18 U.S.C. § 924(c)(1), the government must prove: (1) that defendant knowingly used or carried a firearm, and (2) the use or carrying of the firearm occurred during and in relation to a crime of violence. Finally, to prove aiding and abetting, the government must show that defendants: (1) associated with the criminal enterprise; (2) participated in the venture; and (3) sought by action to make the venture succeed.

<u>Id.</u> (Internal quotations and citations omitted).

may regulate the use of the channels of interstate commerce. . . . Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activity." Id. Third, "Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce." Id. at 1629-30.

The Court found that the Lopez statute did not meet either of the first two categories and thus could only be upheld if the statute regulated an activity that "substantially affected interstate commerce." Id. In holding that the Gun-Free School Zones statute did not fall within the third category, the Court concluded that: (1) the statute by its terms "has nothing to do with commerce or any sort of economic enterprise, however broadly one might define those terms;" id. at 1630; (2) the statute "contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce;" id., and (3) no congressional findings existed to enable the Court "to evaluate the legislative judgment that the activity in question substantially affected interstate commerce." Id.

The carjacking statute, 18 U.S.C. § 2119, was enacted as part of the Anti-Car Theft Act of 1992. The statute specifically provides that:

> Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped or received in interstate or foreign commerce from the person or presence of another by force and violence or by

7

intimidation, or attempts to do so, shall--
    (1) be fined under this title or imprisoned not more than 15 years, or both,
    (2) if serious bodily injury . . . results, be fined under this title or imprisoned not more than 25 years, or both, and
    (3) if death results, be fined under this title or imprisoned for any number of years up to life, or both, or sentenced to death.

18 U.S.C. § 2119.

In reviewing an act of Congress passed pursuant to the Commerce Clause, courts traditionally defer to Congress because "[t]he Commerce Clause grants Congress extensive power and ample discretion to determine its appropriate exercise." Lopez, 115 S.Ct. at 1634 (Kennedy, J., concurring). The proper inquiry on review is "whether a rational basis existed for [Congress] concluding that a regulated activity sufficiently affected interstate commerce." Id. at 1629.[2]

In enacting the Anti-Car Theft Act, Congress chose to attack interstate trafficking in stolen automobiles and auto parts in areas which they felt were the most serious or that had the greatest need for federal coordination. The Act was designed to lower the incentive for auto theft by decreasing the profits and increasing the penalties. Therefore, the Act not only criminalizes carjacking, but also increases the sentences for importation, exportation, and interstate transportation of stolen vehicles, and possession of such vehicles; establishes a national information

---

[2]This view is equally shared by Justice Breyer in his dissent. "[T]he specific question before us, as the Court recognizes, is not whether the 'regulated activity sufficiently affected interstate commerce,' but, rather, whether Congress could have had a 'rational basis' for so concluding." Lopez, 115 S.Ct. at 1658 (Breyer, J., dissenting).

system to check motor vehicle titles; decreases illicit trafficking in stolen auto parts by increasing the requirements on manufacturers to identify auto parts and by establishing a national information system for stolen auto parts; and tightens the supervision of customs on exported autos.

Before the Anti-Car Theft Act was enacted, Congress held hearings and made findings that auto theft was a national problem because of the large volume of stolen cars or stolen car parts that were transported in interstate and international trade. In United States v. Bishop, 66 F.3d 569 (3rd Cir.), cert. denied, 116 S.Ct. 681 (1995), the Third Circuit extensively discussed the congressional findings and concluded:

> Congress specifically found that auto theft is an interstate problem-both that it is often an interstate business itself (albeit an illegal one) and that it gnawed away at the innards of the American economy by imposing other costs on society as well. Congress believed that auto theft was a vast, illicit trade substantially affecting interstate and foreign commerce. Auto theft costs consumers both through the direct economic losses caused by having their property taken from them, and through increased insurance costs. Congress further believed that carjacking was not mere joyriding, but a new and violent form of the illicit interstate business of auto theft. Finally, Congress believed that the national problem of auto theft required a comprehensive, national response addressing the many different aspects of the auto theft problem, because prior state efforts had failed to combat the problem effectively.

Id. at 580.

We hold that the carjacking statute is a valid exercise of congressional authority under the Commerce Clause because Congress could rationally believe that the activity of auto theft has a substantial effect on interstate commerce, the third Lopez category. Unlike other stolen commodities, a vast number of stolen

9

cars will enter interstate and international commerce.[3]  Because

autos are inherently mobile, easy to identify (especially expensive

models) and hard to conceal, criminals often either drive a stolen

car a significant distance from the point of theft, dismantle a

stolen car rapidly into smaller, hard-to-trace parts, or sell the

stolen car in another state to "cleanse" the title.[4]  Thus, the

crime of auto theft rapidly expands into another state or country.

In trying to curb the interstate trafficking in stolen

---

[3]     [T]he problem of auto theft has increased substantially
        in recent years.  According to the uniform crime
        report, between 1984 and 1991 motor vehicle theft
        increased by 61 percent, to almost 1.7 million offenses
        per year.  Around the country, there is an average of
        one motor vehicle theft every 19 seconds.  The total
        value of stolen vehicles now exceeds $8 billion
        annually.
        . . .
        The National Highway Traffic Safety Administration
        has reported estimates that between 10 and 16 percent
        of all thefts occur in order to sell the parts for
        profit.  Others put that figure as high as 40 percent.
        In any case, it's a major problem.  And one reason is
        that the market for stolen parts is enormous.  Repair
        shops can save substantial sums by purchasing parts on
        the black market, and thieves often can deliver parts
        more quickly than legitimate manufacturers.

138 Cong.Rec. S15,205 (daily ed. Sept. 25, 1992) (statement of
Sen. Lautenberg).

[4]     Auto thieves "turn stolen cars into money in three
        ways":  (1) bringing stolen vehicles to "chop shops,"
        where they are taken apart and sold for parts; (2)
        "washing" the titles by obtaining an apparently valid
        title for stolen automobiles; and (3) exporting the
        vehicles for sale abroad.  "Enterprises using all three
        profiteering methods regularly engage in interstate,
        even international, trafficking of automobiles and auto
        parts.  Just as important, auto thieves have a severe
        and deleterious effect on interstate commerce by
        imposing significant costs on automobile consumers."
Bishop, 66 F.3d at 579 (quoting from House Report (Judiciary
Committee) No. 102-851(I) (Aug. 12, 1992), at 14-15, U.S.Code
Cong. & Admin. News 1992, p. 2831).

automobiles, Congress focused on the crime of carjacking because of its seriousness and recent escalation. Statements from the floor during the vote on this bill discussed how carjacking was a high-growth crime that was particularly violent, often resulting in death.[5] One senator expressed law enforcement officials' views that "vehicle thieves find it easier to use force than to deal with anti-theft devices installed in newer model cars. Additionally, carjackers can obtain the keys and registration papers for the cars they steal."[6] Carjackers were reported to often cross state lines,[7] resulting in a need for effective interstate law enforcement cooperation.[8]

In enacting § 2119, Congress could thus rationally believe that carjacking had a substantial effect on interstate commerce and that this national problem required action by the federal government. Carjacking and other forms of auto theft are crucial to the interstate commerce of stolen automobiles and auto parts and

---

[5]138 Cong.Rec. H11,821 (daily ed. Oct. 5, 1992) (statement of Rep. Hoyer) ("Carjacking has become a high-growth industry that includes both professional thieves and parts shops that deal in stolen auto parts, merchandise which can be worth up to 4 times as much as the car itself. And the crime is becoming more and more linked to violence -- to severe beatings, and even murder.").

[6]138 Cong.Rec. S17,961 (daily ed. Oct. 8, 1992) (statement of Sen. Pressler)

[7]In this case, if Coleman and his cohorts had made their 200 mile trip in another part of the country, they could have easily crossed several state lines.

[8] 138 Cong. Rec. H11,821-22 (daily ed. Oct. 5, 1992) (statement of Rep. Norton) ("With good reason, H.R. 4542 makes armed carjacking a Federal offense punishable by imprisonment for up to 15 years. These thefts often cross state lines, and indeed, to do an effective job, law enforcement agencies have had to work regionally and nationally, rather than just locally.")

affect the economy as least as much as wheat grown wholly for personal consumption (Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82 (1942)), utilization of interstate supplies by restaurants (Katzenbach v. McClung, 379 U.S. 294, 299-301, 85 S.Ct. 377, 381-382 (1964)) or purely intrastate extortionate credit transactions (Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357 (1971)).

Contrary to appellant's argument, in holding that § 2119 is constitutional, we are not suggesting that Congress may criminalize every local criminal activity by legislating pursuant to the Commerce Clause. However, "if a criminal activity is rationally believed to be one of the conduits of a nationwide and international pipeline of illegal activity, Congress may justifiably step in and regulate that activity although it is wholly intrastate." Bishop, 66 F.3d at 585; see also, Perez, 402 U.S. at 155, 91 S.Ct. at 1362 (holding that Congress could regulate purely intrastate extortionate credit transactions based on findings that loansharking was a principal source of revenue to organized crime).

In addition, when compared with the Lopez statute, the carjacking statute has none of the deficiencies noticed by the Supreme Court -- lack of any connection with commerce or economic enterprise, broadly defined; lack of a jurisdictional element; and lack of congressional findings on the nexus with interstate commerce. Discussing these in reverse order, Congress made ample findings to support a rational belief that a sufficient nexus exists between carjacking, as a form of auto theft, and interstate

12

commerce. Additionally, the carjacking statute has a jurisdictional element; i.e., the stolen car must have been "transported, shipped, or received in interstate or foreign commerce." 18 U.S.C. § 2119.

Finally, the carjacking statute by its nature implicates a possible commercial or economic venture -- the taking of a vehicle which in turn can be sold or "chopped" for parts. By contrast, under the Gun-Free School Zones Act which the Supreme Court struck down in Lopez, the criminal activity was simple possession of a firearm within 1000 feet of a school. "The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." Lopez, 115 S.Ct. at 1634. In § 2119, the criminal activity is auto theft which, as explained above, is an intensely economic crime which has a strong nexus with interstate commerce.

We join the other circuit courts that have considered this issue in upholding the constitutionality of the carjacking statute in light of Lopez. United States v. Bishop, 66 F.3d 569 (3rd Cir. 1995); United States v. Robinson, 62 F.3d 234 (8th Cir. 1995); United States v. Oliver, 60 F.3d 547 (9th Cir. 1995); United States v. Carolina, 61 F.3d 917, 1995 WL 422862 (10th Cir. 1995) (Unpublished Disposition); and United States v. Washington, 61 F.3d 904, 1995 WL 424419 (6th Cir. 1995) (Unpublished Disposition). We are content with our pre-Lopez decision in United States v. Harris, 25 F.3d 1275 (5th Cir. 1994), where we upheld § 2119 and stated: "Because of the obvious effect that carjackings have on interstate

13

commerce, we hold that the carjacking statute is a valid exercise of Congress's Commerce Clause powers."  Id. at 1280 (citing United States v. Johnson, 22 F.3d 106, 109 (6th Cir. 1994)).  See also United States v. Bell, 46 F.3d 442 (5th Cir. 1995).

III.

For the reasons stated above, we find no merit in defendant's arguments and thus affirm the district court.

AFFIRMED.