UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 94-10410
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSE INEZ ZAPATA,
HECTOR HERNANDEZ, a/k/a Torcha,
MARCO ANTONIO ZAPATA-RODRIGUEZ, JR.,
JOSE ANGEL CASTILLO,
MARCO ANTONIO ZAPATA, III,
NORMA AUGUSTINA RODRIGUEZ,

Defendants-Appellants.

*****************************************

_____

No. 94-10628
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EFRAIN PUENTE-CERVANTES,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Texas
(3:93-CR-285-R)
_____

April 4, 1996

Before KING, DAVIS, and BARKSDALE, Circuit Judges.

PER CURIAM:[*]

For these numerous challenges to convictions and sentences on various drug-related charges, primarily at issue are the admissibility of evidence regarding three murders, and the effect of post-verdict relationships between several case agents and jurors.  We **AFFIRM**.

## I.

The appellants were charged in a 30-count superseding indictment.  Jose Inez Zapata, Marco Antonio Zapata, III, Hector Hernandez, Marco Antonio Zapata-Rodriguez, Jr., Jose Angel Castillo, and Norma Augustina Rodriguez were tried together in January 1994; Efrain Puente-Cervantes, that April.  Each appellant was convicted on some charges and acquitted on others, and two other defendants were acquitted in the January trial.

## II.

Five of the six appellants from the January trial contend that the district court erred by admitting evidence of murders.  All appellants assert that they are entitled to new sentencing hearings because of post-verdict relationships between two case agents and two jurors from that trial.  In addition, Inez Zapata maintains that the district court erred by denying his severance motion, that

---

[*]     Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

the evidence is insufficient to sustain his cocaine conspiracy conviction, and that the court committed two errors in sentencing; Norma Rodriguez challenges the sufficiency of the evidence on her money laundering conviction and charges that the court failed to make a factual finding necessary for her telephone facilitation sentence; Hernandez raises three sentencing issues; and Puente contests several evidentiary rulings, as well as his sentence.

### A.

Over objection, the district court admitted evidence of the July 1993 execution-style murders of three men in Chicago, one of whom was Esteban Zapata, the cousin of appellant Zapata, Jr. Castillo, Hernandez, Inez Zapata, Zapata, Jr., and Zapata, III, contend that the evidence was extrinsic and inadmissible under FED. R. EVID. 404(b), because the Government failed to connect them to the murders or to establish that the murders were connected to the charged offenses.[1]

The admission of this evidence is reviewed only for abuse of discretion. *E.g.*, **United States v. Coleman**, ___ F.3d ___, ___,

---

[1]     FED. R. EVID. 404(b) provides in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....

1996 WL 97096, at *1 (5th Cir. 1996). "To determine whether `other acts' evidence was erroneously admitted, first we must determine whether the evidence was intrinsic or extrinsic." *Id*. "[E]vidence is intrinsic, when the evidence of the other act and evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries, to the crime charged." *Id*. (internal quotation marks and citation omitted). Such evidence "is admissible to complete the story of the crime by proving the immediate context of events in time and place". *Id*. "Intrinsic evidence does not implicate Rule 404(b), and consideration of its admissibility pursuant to Rule 404(b) is unnecessary." *Id*. at *2 (internal quotation marks and citation omitted).

We agree with the district court's implicit finding that the murders were inextricably intertwined with the charged conspiracies. The Government presented evidence that Esteban Zapata (as noted, the cousin of Zapata, Jr., and one of the murder victims) was in charge of the Chicago branch of the Zapata organization, which distributed approximately 300 kilograms of cocaine from late 1992 into the spring of 1993; and that, by April 1993, $300,000 in drug proceeds was owed by the Chicago branch to Zapata, Jr., and co-conspirator Marco Antonio Rodriguez-Hernandez.[2]

---

[2]    Rodriguez-Hernandez was indicted along with the appellants, but was a fugitive at the time of trial.

- 4 -

Zapata, Jr., was coming under increasing pressure for payment from their supplier in Mexico.

In addition, the Government presented evidence that Zapata, Jr., fronted marijuana to Daniel Ortegon (Hernandez's cousin); that Ortegon's associates in Florida had to lower the price of the marijuana because of its poor quality; and that, as a result, Ortegon, through Hernandez, owed Zapata, Jr., between $50,000 and $60,000. Ortegon's attempts to satisfy his debt by returning the marijuana, by turning over his Florida customers to Hernandez, or by obtaining 200 kilograms of cocaine for Zapata, Jr., were unsuccessful. Ortegon testified that in an intercepted telephone conversation, which was played for the jury, Zapata, Jr., and Hernandez discussed, in code, sending Ortegon to Mexico to be executed for his drug debt. Instead, Ortegon's debt and the Chicago debt were satisfied in a package deal: Ortegon testified that, in June 1993, Hernandez told him that "they" had a problem in Chicago, "one of them" was a cousin of Zapata, Jr., and that Zapata, Jr., wanted Hernandez to go to Chicago and "take care of it".

Esteban Zapata and two other individuals involved in the Chicago branch of the Zapata organization were found murdered, execution-style, in Chicago on July 12, 1993. There was no evidence of forced entry, no sign of a struggle, and no evidence that robbery was a motive for the murders. The investigating officer testified that eyewitnesses had identified an individual

seen leaving Esteban Zapata's apartment just after shots were fired, but that individual was not named.[3]  In early August 1993, a Nebraska police officer stopped a vehicle driven by Zapata, Jr., in which Hernandez was a passenger.  On obtaining identification from Hernandez, the officer saw a piece of paper in Hernandez's wallet with the name "Esteban Zapata" written on it; failing to note any significance, the officer returned the wallet and paper to Hernandez.  A few hours later, the officer was asked to locate the piece of paper; he obtained the wallet, but the paper was missing.

The evidence of the murders completed the story about the Chicago operations of the Zapata organization, which were inextricably intertwined with the Dallas operations of that organization; explained the intercepted conversations among the co-conspirators; and corroborated the testimony of Ortegon and other Government witnesses.  Moreover, the murders and the reason they were ordered -- retribution for failing to pay the conspiracy for drugs -- was highly relevant to establish the existence of the conspiracy and the nature of its operations.  Accordingly, because that evidence was intrinsic, the district court was not required to analyze its admissibility under FED. R. EVID. 404(b), and it did not abuse its discretion by admitting it.

B.

The verdicts for the first trial were rendered in late January

---

[3]  At sentencing, there was evidence that Hernandez was the individual identified.

1994, with sentencing in mid-April and mid-May of that year; the Puente verdict was rendered in late April 1994, with sentencing that June. That September, after the appellants had filed notices of appeal, the district court informed counsel that he had received information about relationships between two of the jurors in the January trial, and two of the case agents who testified at trial and/or sentencing. The appellants moved for a new trial.

At an evidentiary hearing in January 1995, a juror and a DEA agent admitted having an affair from mid-February until April 1994. Another juror and an FBI agent admitted having sexual intercourse on February 11, 1994. (The FBI agent previously had denied the relationship, and he refused to answer questions about it at the evidentiary hearing until instructed to do so by the court.)

The district court denied the motion for new trial, finding that the agents and jurors first had personal contact on January 28, following the verdict, in the jury room; that the intimate relationships did not develop until mid-February; and that the relationships had "nothing to do with sentencing". The appellants from the first trial contend that the relationships between the agents and the jurors so impaired the integrity of the fact-finding process as to deny due process, and assert that the credibility findings at sentencing might have been different had the court known about those relationships and the FBI agent's lies. Puente (tried separately) contends that his conviction should be reversed because he should have been informed about the relationships

- 7 -

between the agents and jurors in the January trial, for use in impeachment of one of the agents, who testified for the Government at his trial and was its only witness at sentencing.

The district court's refusal to grant a new trial is reviewed only for abuse of discretion, **United States v. Ruggiero**, 56 F.3d 647, 653 (5th Cir.), *cert. denied*, ___ U.S. ___, 116 S. Ct. 397, 486 (1995). Puente has not shown that the undisclosed relationships affected the outcome of his trial. *See, e.g., **United States v. Bagley***, 473 U.S. 667, 682 (1985). Nor were any of the appellants' sentences affected. After hearing evidence about the relationships, the district court found that they had no effect on its credibility findings at sentencing.

At oral argument, the appellants acknowledged that their sentences were based primarily on evidence presented at trial, thus conceding that the district court's credibility findings at sentencing had no effect on their sentences. Therefore, they ask primarily that we "send a message" to the FBI and the DEA by granting new sentencing hearings. That is not our role. Instead, it is to determine whether the district court abused its discretion by denying a new trial. Clearly, it did not.

C.

Inez Zapata contends that he was unfairly prejudiced by the denial of his severance motion, because of the gross disparity in the evidence against him and his co-defendants (including the

Chicago murders), which made it impossible for the jury to separate the evidence applicable to each defendant. "In conspiracy cases, the general rule is that persons indicted together should be tried together." *United States v. Fields*, 72 F.3d 1200, 1215 (5th Cir. 1996).

"Severance is a matter left to the sound discretion of the trial court, and a defendant is not entitled to severance unless he can demonstrate specific compelling prejudice that actually results in his having received an unfair trial." *United States v. Capote-Capote*, 946 F.2d 1100, 1104 (5th Cir. 1991), *cert. denied*, 504 U.S. 942 (1992); *see* FED. R. CRIM. P. 14. "[N]either a disparity in the amount of evidence against each defendant nor a supposition that the evidence against other defendants `spilled over' and prejudiced the defendant constitute compelling prejudice." *Fields*, 72 F.3d at 1215.

The jury was instructed to consider the evidence against each defendant separately. It apparently had no difficulty following that instruction, inasmuch as it acquitted two defendants on all charges, and each of the others, including Inez Zapata, were convicted on some counts and acquitted on others. *See Fields*, 72 F.3d at 1215 (stating that district court remedied any prejudicial effect by instructing jury to limit its consideration of the evidence to the appropriate defendant); *United States v. McCord*, 33 F.3d 1434, 1452 (5th Cir. 1994) (stating that acquittal of each

defendant on at least one count reflects that jury was able to sort and consider separately evidence applicable to each count and each defendant), *cert. denied*, ___ U.S. ___, 115 S. Ct. 2558 (1995). There was no abuse of discretion.

### D.

Next, Inez Zapata asserts that the evidence is insufficient to support his cocaine conspiracy conviction. In reviewing a sufficiency of the evidence challenge, we view the evidence in the light most favorable to the verdict to determine whether a reasonable jury could find that the evidence establishes guilt beyond a reasonable doubt. *E.g.*, **United States v. Gonzalez-Rodriguez**, 966 F.2d 918, 920 (5th Cir. 1992). For a narcotics conspiracy charge, the government must prove beyond a reasonable doubt: (1) that two or more persons agreed to violate the narcotics laws; (2) that each alleged conspirator knew of the conspiracy and intended to join it; and (3) that each alleged conspirator participated in the conspiracy. *E.g.*, **United States v. Flores-Chapa**, 48 F.3d 156, 161 (5th Cir. 1995).

Although the evidence of Inez Zapata's participation in the cocaine conspiracy was not as overwhelming as that of his participation in the marijuana conspiracy, which he does not challenge on appeal, it was, nevertheless, sufficient. For example, the evidence includes intercepted telephone conversations in which Inez Zapata made arrangements for the purchase of cocaine;

and in which Zapata, Jr., discussed a cocaine and marijuana transaction with Hernandez, and told Hernandez that he would be out of town, but that his brother, Inez Zapata, or his son, Zapata, III, could take care of the transaction while he was away.

## E.

Norma Rodriguez, who was married to Inez Zapata, challenges the sufficiency of the evidence to support her money laundering convictions under 18 U.S.C. § 1956(a)(1)(A)(i), based on her use of cash (approximately $1200 over several months) to purchase money orders to pay cellular telephone bills for herself and Zapata, Jr. The conviction required proof that Rodriguez "(1) knowingly conducted a financial transaction; (2) which involved the proceeds of an unlawful activity; and (3) with the intent to promote or further that unlawful activity". *United States v. Morris*, 46 F.3d 410, 423 (5th Cir.), *cert. denied*, ___ U.S. ___, 115 S. Ct. 2595 (1995). Rodriguez contends that the Government failed to prove the second and third elements.

The evidence included intercepted telephone conversations in which Rodriguez discussed drug transactions and in which she warned other individuals of the presence of police in the neighborhood. At trial, Rodriguez admitted that she was aware of her husband's (Inez Zapata) drug use, and had obtained drugs for his personal use; she admitted also that, in addition to purchasing money orders to pay Zapata, Jr.'s, cellular telephone bills, she rented cars for

Zapata, Jr., and Zapata, III, and obtained credit cards for Zapata, Jr.

The jury was entitled to reject Rodriguez's innocent explanations for her conduct, to infer that she was well aware of the drug-dealing activities of Zapata, Jr., Zapata, III, and her husband, and to infer that she knew that the funds used to pay the cellular telephone bills were proceeds of that activity. In light of the evidence of the pervasive use of cellular telephones, by Rodriguez and Zapata, Jr., as well as others, to conduct the drug-dealing activities of the Zapata organization, the jury could have inferred also that Rodriguez paid the cellular telephone bills with the intent to promote drug-dealing.

F.

Puente maintains that the district court erred by admitting drug ledgers seized from others and photographs of weapons, because the Government failed to connect the evidence to him. "Admission of evidence is reviewed for abuse of discretion, and even if abuse is found, the error is reviewed under the harmless error doctrine." *United States v. Capote-Capote*, 946 F.2d at 1105; FED. R. EVID. 103(a).

The district court did not abuse its discretion by admitting evidence related to Puente's co-conspirators. "[P]roof of the existence of the charged conspiracy is not confined to the acts of the defendant[] on trial", *United States v. Sepulveda*, 710 F.2d

188, 189 (5th Cir. 1983), because, as the district court instructed the jury, if the defendant is a member of the alleged conspiracy, the statements and acts of other members of the conspiracy, done in furtherance of it, may be considered against the defendant.

## G.

Puente claims next that the district court erred by allowing jurors to consider English translations of intercepted telephone conversations conducted in Spanish, prior to their being admitted into evidence. "Whether the jury should have the use of transcripts is a matter left to the sound discretion of the trial judge." *United States v. Rena*, 981 F.2d 765, 767 (5th Cir. 1993). Because the English translations were admitted into evidence, which Puente does not challenge, the district court did not abuse its discretion by allowing the jurors to use the translations prior to admission, while they listened to the tapes.

## H.

Puente asserts also that the district court erred by admitting a DEA agent's testimony that a cooler delivered to Puente by Zapata, Jr., contained five kilograms of cocaine, because the testimony was based on speculation. Because Puente was able to cross-examine the agent about the basis for his belief that the cooler contained cocaine (intercepted telephone conversations and surveillance), and about the fact that the agent did not see the contents of the cooler, the admission of the testimony did not

- 13 -

affect Puente's substantial rights.  *See* FED. R. EVID. 103(a).

## I.

Puente's final contention is that the district court erred at sentencing by admitting the hearsay testimony of a DEA agent regarding statements made by co-defendant Castillo with respect to the quantity of drugs attributable to Puente, and that it erroneously overruled his request for a continuance of the sentencing hearing to obtain Castillo's testimony, thereby denying him his constitutional right of confrontation.  There was no error.

"In making its determination of the [quantity of drugs] to be attributed to [a defendant], the district court is not limited to the quantity proved at trial nor is it limited to evidence admissible at trial."  *United States v. Morris*, 46 F.3d at 425. The right to confrontation "is substantially limited at a sentencing hearing; the district court may even base its findings on out-of-court statements".  *United States v. Sherrod*, 964 F.2d 1501, 1507 (5th Cir.), *cert. denied*, 506 U.S. 1041 (1992), and *cert. denied*, 507 U.S. 953, 975 (1993).  And, "[a]t sentencing, the district court may consider hearsay testimony which it finds reliable".  *United States v. Rodriguez*, 62 F.3d 723, 725 n.9 (5th Cir. 1995).

## J.

Inez Zapata charges that the district court erred by basing his sentence on 200 kilograms of cocaine distributed by others,

claiming there was no factual finding that he was part of a jointly-undertaken scheme to distribute cocaine.  Needless to say, the sentencing "court's findings about the quantity of drugs on which a sentence should be based are factual findings which we review for clear error".  *United States v. Mitchell*, 964 F.2d 454, 457 (5th Cir. 1992).

The district court credited the case agent's testimony at sentencing regarding the quantity of cocaine attributable to Inez Zapata; although the sentence was based only on the 200 kilograms that the PSR concluded were reasonably foreseeable to Inez Zapata, the district court found, based on the agent's testimony, that the actual quantities were higher than those reflected in the PSR.  By crediting the agent's testimony as to the 200 kilograms of cocaine, the district court adopted the PSR's conclusion regarding Inez Zapata's ability to foresee the distribution of 200 kilograms of cocaine.  Moreover, the court's specific rejection of Inez Zapata's objection to the amount of cocaine charged in the PSR satisfies FED. R. CRIM. P. 32.  *See United States v. Golden*, 17 F.3d 735, 737 (5th Cir. 1994).

## K.

Inez Zapata claims next that the two-level increase in his offense level for possession of a weapon, pursuant to U.S.S.G. § 2D1.1(b)(1), was erroneous because there was no evidence that he possessed any weapons, and it was not foreseeable to him that

weapons were stored in the home of his brother, Zapata, Jr.; Hernandez adopted this claim. "The district court's decision to apply § 2D1.1(b)(1) is essentially a factual determination reviewable under the clearly erroneous standard." *United States v. Rodriguez*, 62 F.3d at 724.

There was ample evidence to support the finding that Inez Zapata was involved with weapons, including evidence of his managerial role and his presence at his brother's residence, from which several weapons were seized. Another example is an intercepted telephone conversation in which Inez Zapata referred to getting his machine gun. The evidence also supports the enhancement for Hernandez, because of his involvement in the Chicago murders, as discussed *infra*.

## L.

Rodriguez asserts that her sentence for telephone facilitation should be vacated because the district court made no finding as to drug quantity or type, and there was insufficient evidence to support any such finding. But, even assuming that the court erred by failing to make a finding as to drug quantity and type, any error is harmless, because this count was grouped with the money laundering counts, and Rodriguez's sentence was based on the guidelines for the latter. *See Williams v. United States*, 503 U.S. 193, 203 (1992) (if party defending sentence persuades court of appeals that district court would have imposed same sentence absent

erroneous factor, remand is not required).

## M.

Hernandez contends that the district court erred by adding three points to his criminal history score, pursuant to U.S.S.G. § 4A1.1(d) and (e), for commission of the instant offenses less than two years after release from imprisonment.  Even assuming error, it was harmless because, even without the addition of these points, Hernandez's criminal history points exceeded the total necessary for classification as a Category VI offender; therefore, his guideline range would have been the same.  *See* U.S.S.G. Sentencing Table; **Williams**, 503 U.S. at 203.

## N.

Hernandez asserts also that the evidence does not support his three-level upward departure, pursuant to U.S.S.G. § 5K2.1 (permitting upward departure if death resulted from offense), based on findings that he committed the Chicago murders and that they were connected to the offenses of conviction.  "The district court is given wide discretion to decide whether aggravating factors exist to support an upward departure" under § 5K2.1.  **United States v. Davis**, 30 F.3d 613, 615 (5th Cir. 1994), *cert. denied*, ___ U.S. ___, 115 S. Ct. 769 (1995).

The findings were based on the testimony at trial and an FBI agent's testimony at sentencing that Hernandez had been identified by two witnesses as one of three men leaving the murder scene.  As

stated, the district court may rely on hearsay in sentencing; moreover, it was entitled to reject the testimony of Hernandez's alibi witnesses that Hernandez was in Texas at the time of the murders. The findings were not clearly erroneous; accordingly, the upward departure was not an abuse of discretion.

### III.

For the foregoing reasons, the judgments are

**AFFIRMED.**