United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 10, 2006**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 05-20144

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

ZHENG XIAO YI,

Defendant–Appellant.

Appeal from the United States District Court
for the Southern District of Texas
No. 4:04-CR-32

Before GARWOOD, HIGGINBOTHAM, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

We previously issued an opinion that was predicated, in part, on a misrepresentation by the government. *See United States v. Yi*, 451 F.3d 362 (5th Cir. 2006). Upon reconsideration, we withdraw the prior opinion in its entirety and replace it with the following.

The defendant appeals his conviction and sentence for six counts of trafficking in counterfeit goods, in violation of 18 U.S.C. § 2320. For the following reasons, we affirm his convictions as to five counts, vacate his conviction as to the sixth count, vacate his sentence, and remand for

-1-

resentencing.

## I. FACTS AND PROCEEDINGS

Zheng Xiao Yi ("Zheng") owned XYZ Trading Corp. ("XYZ"), a discount retail store in Houston, Texas. In July 2003, U.S. Immigration and Customs Enforcement ("ICE") agents at the arrival port in Norfolk, Virginia, conducted an inspection of a container shipped from China and intended for XYZ. ICE Agent Stephanie McKinney thought that the stated value of the enclosed goods reflected on the invoice did not justify the high costs of shipping the container; a full inspection showed that the container's contents did not match the invoice. Agent McKinney suspected that some of the goods in the container might be counterfeit, so she photographed them and sent the pictures to the respective trademark owners, Gillette and Underwriters Laboratories ("UL").[1] The trademark owners indicated that the goods were not made by them, and Agent McKinney seized the shipment on August 18, 2003. Agent McKinney determined that another shipment from China to XYZ would arrive in a few weeks, and she designated that shipment for interception. This second shipment, which also was determined to contain counterfeit goods, was seized on September 15, 2003.[2]

Because of the discovery of the counterfeit goods in the August shipment, ICE Agent Jacqueline Irwin, posing undercover as the owner of a party store, visited XYZ on August 20, 2003. A salesperson named "Anna" showed her around the store and answered her questions regarding several products, including batteries and extension cords. Anna told Agent Irwin that the batteries

---

[1]The counterfeit goods were 50-foot extension cords (Count Three); "Dinacell" brand batteries (Count Two); and "Dinacell" flashlights with batteries (Count Two).

[2]This shipment contained 4,000 pairs of counterfeit Nike sandals (Count Six).

-2-

"were not as good as the real ones" and not to sell them in the party store because she "could get in trouble." Anna said that most of XYZ's customers sold the batteries in flea markets "because they were less stricter [sic] over there." Anna told Agent Irwin that the extension cords were safe to use. Agent Irwin purchased several of the items, at a cost of sixty-five cents to $1.25 each, and delivered the items to another ICE agent, Steven Lopez. Agent Irwin, again undercover, visited XYZ a second time on September 2, 2003, and noticed several of the same items for sale.

Agent Lopez applied for and was granted a search warrant, which was executed on November 7, 2003. Agent Lopez and other agents seized batteries, extension cords, other UL-labeled products, toys, and business records identifying Zheng as XYZ's original incorporator and sole shareholder. Agent Lopez also discovered two cease-and-desist letters sent one week before the search from Gillette and UL to XYZ, addressed to Zheng. The search did *not* uncover any counterfeit Nike sandals or any cease-and-desist letter from Nike.

Prior to the search, because the seized goods originated in China, Agent Lopez had suspected that illegal Chinese immigrants may have been on the premises. Accordingly, Agent Jerry Liu, an ICE agent fluent in Mandarin Chinese, accompanied the search party. During the execution of the search warrant, Agent Liu asked Zheng for identification; Zheng had no documentation permitting him to be in the United States, and a computer check revealed that Zheng had been ordered deported in 1997. Agent Liu immediately placed Zheng in custody. After reading Zheng the proper *Miranda* warnings, Agent Liu translated questions from Agent Lopez to Zheng. Both Agents Lopez and Liu testified that Zheng admitted that he knew "the stuff that he was importing was fake." Zheng also admitted that he was the owner of XYZ and that he had received the cease-and-desist letters.

At some point during the search, after seeing Agent Liu walk back inside from a cigarette

break, Zheng asked Agent Liu if he could have a cigarette. Agent Liu then took Zheng outside where Zheng, according to Agent Liu's testimony, offered a $50,000 bribe if Agent Liu would release him. Agent Liu also testified that Zheng again admitted that some of the goods in his store were "fake or counterfeit" and that Zheng said he "wouldn't continue in this business any more" if Agent Liu let him go.

Subsequently, Zheng was indicted on six counts of trafficking in counterfeit goods, in violation of 18 U.S.C. § 2320.[3] During Zheng's trial in July 2004, Agents McKinney, Irwin, Lopez, and Liu all testified. Additionally, the government called as witnesses representatives from the trademark-owning companies, Gillette, Marvel, Nike, and UL. The representatives identified various features of the seized goods that, in their view, violated the companies' registered trademarks. Additionally, the representatives testified as to why preventing counterfeiting was important to their businesses. The government also called as a witness ICE Agent Nicole Palestina, an import specialist, who testified to the retail value of the actual goods that the counterfeits mimicked. At the close of the government's case, Zheng moved for a judgment of acquittal, which the district court denied. The defense then rested without presenting any evidence.

The jury convicted Zheng on all six counts of the indictment. The jury also made supplemental findings that the infringed goods had a retail value of $304,812 and that the offenses related to the goods in Counts Four and Five, bearing the UL symbol, involved a "conscious or reckless risk of bodily injury." In February 2005, after the Supreme Court's decision in *United States*

---

[3]Count One included batteries and flashlights that infringed Gillette trademarks. Count Two included additional batteries that infringed Gillette trademarks. Count Three included Spider-Man phones and action figures that infringed Marvel trademarks. Count Four included extension cords that infringed UL trademarks. Count Five included extension cords, hair clippers, and powerstrips that infringed UL trademarks. Count Six included sandals that infringed Nike trademarks.

*v. Booker*, 543 U.S. 220 (2005), the district court adopted the recommendations of the Pre-Sentence Report ("PSR") and sentenced Zheng to 63 months imprisonment, the top of the applicable guideline range.

## II. DISCUSSION

Zheng appeals his convictions, arguing that the evidence was insufficient to support the jury's verdict and that the district court erroneously admitted various testimony. He also appeals his sentence, arguing that the district court erred in its interpretation and application of United States Sentencing Guideline ("U.S.S.G.") § 2B5.3.

### A. Sufficiency of the Evidence

### (1) Standard of Review

Since Zheng timely moved for a judgment of acquittal, he preserved his sufficiency argument for appeal. *See United States v. Gonzales*, 436 F.3d 560, 571 (5th Cir.), *cert. denied*, 126 S. Ct. 2363 (2006). Therefore, so long as a rational jury could have found the elements proven beyond a reasonable doubt, this court must uphold the jury's verdict. *Id.*; *United States v. Adair*, 436 F.3d 520, 525 (5th Cir. 2006). This court views "the evidence in the light most favorable to the government with all reasonable inferences and credibility choices made in support of the jury verdict." *Gonzales*, 436 F.3d at 571. "The intent necessary to support a conviction can be demonstrated by direct or circumstantial evidence that allows an inference of an unlawful intent, and not every hypothesis of innocence need be excluded." *United States v. Aggarwal*, 17 F.3d 737, 740 (5th Cir. 1994).

### (2) Analysis

Zheng was convicted on six counts of violating 18 U.S.C. § 2320(a), which punishes

"[w]hoever intentionally traffics or attempts to traffic in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services . . . ." To prove a violation of the statute, the government must establish: "(1) the defendant trafficked or attempted to traffic in goods or services; (2) such trafficking, or the attempt to traffic, was intentional; (3) the defendant used a counterfeit mark on or in connection with such goods or services; and (4) the defendant knew that the mark so used was counterfeit." *United States v. Hanafy*, 302 F.3d 485, 487 (5th Cir. 2002). *See also United States v. Sultan*, 115 F.3d 321, 325 (5th Cir. 1997).

On appeal, Zheng argues that the government did not prove beyond a reasonable doubt the fourth element, Zheng's knowledge of the counterfeit nature of the mark.[4] Zheng presented the following evidence at trial through cross-examination, which he argues proves he had no knowledge of any counterfeiting: The vast majority of merchandise in the store was legitimate; the counterfeit items were offered for resale at XYZ in the same condition Zheng had purchased them; all counterfeit markings had been placed on the goods prior to arrival at XYZ; some or all of the real versions of the products were manufactured in China, where the counterfeit products originated; some of the items had indications of legitimacy, such as safety warnings; the cease-and-desist letters from Gillette and UL were written in English, a language that Zheng neither read nor wrote; he did not receive cease-and-desist letters from Marvel or Nike; the undercover visits and search of XYZ did not uncover any items similar to the Nike sandals; and he was never given the option to inspect the second container seized by ICE, which contained the counterfeit Nike sandals.

---

[4]In passing, Zheng also argues that the evidence was insufficient to prove that the batteries in Counts One and Two were counterfeit. His main argument is that the battery names were not "Duracell." His argument has no merit: Gillette trademarked the use of a copper-top and black-body battery, the trademark was introduced at trial, and a rational jury could have found that the seized goods bore the trademarked characteristics.

In support of the jury's verdict, the government points to the evidence tending to show Zheng knew he was involved in the sale of counterfeit merchandise: Zheng declined to physically inspect the first of the seized containers;[5] prior to the execution of the search warrant, Gillette and UL sent Zheng cease-and-desist letters, which he admitted receiving; Zheng's employee, Anna, told Agent Irwin that the batteries were not as good as the real ones and that she might get in trouble if she sold them in a retail store; Zheng admitted that he knew "the stuff that he was importing was fake;" Zheng admitted that he was the sole owner of XYZ; and Zheng attempted to bribe Agent Liu and stated, "If you let me go, I wouldn't continue in this business any more." Though the government does not make the argument, the obviously poor quality of some of the goods tends to show that Zheng knew those goods were counterfeit.

With respect to the first five counts of conviction—involving the Gillette, UL, and Marvel products—Zheng's admissions and bribery attempt are particularly probative, and a jury could rely on them alone in determining his intent to traffic in certain counterfeit goods. The noticeably poor quality of most of the goods, purchased in a store owned by Zheng, provides further support. As well, with respect to the cease-and-desist letters, a jury could infer that, since Zheng admitted receiving the letters, he also was able to determine their content. The jury, acting rationally, relied upon the specific and general evidence detailed above to convict Zheng on five counts. Therefore, the evidence is sufficient to support the jury's verdict with respect to those counts. *See Gonzales*, 436 F.3d at 571.

---

[5]The transcript clarifies the importance of Zheng's omission. Rather than inspecting the container to see if the imported goods matched what XYZ ordered, Zheng offered to pay the duties of the entire shipment, even though ICE had determined the August 18, 2003, shipment contained more than was on the original invoice. Zheng could have chosen to abandon the shipment and not pay the duty fees.

However, no rational jury could conclude beyond a reasonable doubt that Zheng was guilty of the sixth count of conviction, attempting to traffic or trafficking in counterfeit Nike sandals. Zheng was a wholesale importer, with a warehouse and a store. The quantum of counterfeit items represented only a small percentage of his overall products. During the earlier undercover visits by Agent Irwin, no Nike sandals or similar items were found. When agents executed the search warrant, the counterfeit goods in the store were batteries, flashlights, extension cords, hair clippers, and toys; the store contained *no* counterfeit Nike sandals, which would have been at least an indication that Zheng knew what he was importing in the second container. It is undeniable that Zheng knew *some* of the items in his store were counterfeit; he admitted as much to government agents during the search, and he tried to bribe his way to freedom. However, given that Zheng's admission and bribe attempt came at the time his store was searched, the inferences of guilt that arise from his statements only reasonably pertain to the goods in his store in November 2003—not to the counterfeit Nike sandals seized at the customs depot on September 15, 2003.

The only evidence the jury heard regarding whether Zheng might have known of the contents of the second container is that an invoice, found at XYZ during the search, identified the contents as rubber slippers with a product identification number of "2039-4." There is no record evidence indicating what that number description means.[6] The government simply failed to find out or put forth such evidence.

With such, at best, weak and attenuated circumstantial evidence, no rational jury could have found beyond a reasonable doubt that Zheng attempted to traffic or trafficked in the counterfeit Nike

_____

[6]At trial, Zheng's counsel asked Agent McKinney, "So, we don't know whether or not he actually knew there were Nike slippers or what you claim to be counterfeit Nike slippers in that box, do you?" Agent McKinney responded, "I don't know if he knew that the description said it or not."

sandals. *See United States v. Alvarez*, 451 F.3d 320, 337 (5th Cir. 2006) ("The Government attempts to cobble together inferences from the testimony presented in support of the verdict . . . . While a rational jury might make the chain of inferences [in support of the verdict] . . . a reasonable jury could not conclude *beyond a reasonable doubt* that the elements of the crime have been proven."). Accordingly, we vacate this count of conviction.[7]

**B.     Rule 404(b) Objections**

**(1)     Standard of Review**

This court reviews for abuse of discretion a district court's decision to admit or exclude evidence. *United States v. Cantu*, 167 F.3d 198, 203 (5th Cir. 1999). In a criminal case, Rule 404(b) evidence must "be strictly relevant to the particular offense charged." *United States v. Hernandez-Guevara*, 162 F.3d 863, 869 (5th Cir. 1998) (internal quotation omitted). Even if the district court abused its discretion, this court will not overturn a conviction unless the defendant was prejudiced by the erroneous admission of evidence. *United States v. Coleman*, 78 F.3d 154, 156 (5th Cir. 1996).

---

[7]As previously mentioned, this opinion is our second. On the first go-around, the government misrepresented a fact material to our decision to uphold Zheng's conviction for trafficking in the counterfeit Nike sandals: that Zheng was given and declined the opportunity to inspect the second shipment containing the Nike sandals. Though the government now concedes its misrepresentation, it nonetheless tries to salvage the conviction. In its response to the petition for rehearing, the government argues that Zheng should have abandoned the second container, and apparently all subsequent imports, because the inspection of the first container "should have alerted a prudent businessman to the potential for discrepancy between what had been ordered and what had been shipped."

Such an argument plainly is meritless and solidifies our view that the evidence does not support Zheng's conviction on this count. That ICE inspected one internationally-shipped container does not indicate a widespread problem for Zheng, whom the government portrays as a knowledgeable businessman whose wholesale business is based upon importing goods from abroad. We are quite certain that other "prudent businessm[e]n," perhaps even large corporations that import thousands of containers of goods, would differ with the government's argument that they should immediately abandon *all* incoming shipments if ICE even *inspects* (not even *seizes*) but one.

**(2)	Rule 404(b)**

Rule 404(b) prohibits evidence of other acts to prove the defendant's conformity therewith. *See* FED. R. EVID. 404(b). However, the rule permits other-acts evidence "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." *Id.* Admission of Rule 404(b) evidence must follow a two-step test incorporating Rules 401 and 403: The extrinsic evidence (1) must be relevant to an issue other than the defendant's character and (2) must have probative value that is not substantially outweighed by its prejudicial effect on the jury. *See United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc); FED. R. EVID. 401, 403. *See also United States v. Redd*, 355 F.3d 866, 879 (5th Cir. 2003).

Rule 404(b), however, only applies to extrinsic evidence and does not prohibit intrinsic evidence. This circuit has defined intrinsic evidence:

> Evidence of acts other than conduct related to the offense is intrinsic when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged.

*United States v. Freeman*, 434 F.3d 369, 374 (5th Cir. 2005) (internal quotations omitted). Such evidence is "admissible to complete the story of the crime by proving the immediate context of events in time and place." *Coleman*, 78 F.3d at 156. Intrinsic evidence is permissible "so that the jury may evaluate all the circumstances under which the defendant acted." *United States v. Royal*, 972 F.2d 643, 647 (5th Cir. 1992) (internal quotation omitted).

**(3)	Immigration Status**

The government raised Zheng's immigration status several times at trial.[8]	Most

---

[8]For example, in its opening statement, the government indicated that Agent Liu would testify that he arrested Zheng during the execution of the search warrant after determining that Zheng was

conspicuously, in its rebuttal closing argument, the government mentioned that Zheng, upon previously going through removal proceedings, "was given the privilege of voluntarily leaving the United States. Instead of doing so, he absconded. He took the easy way out. He ran." Zheng's counsel objected, and the district court sustained the objection and instructed the jury "to disregard the comment. It's not evidence in any way in this case."

Zheng contends that introduction of his status as an illegal alien violated Rule 404(b) because it was irrelevant and enormously prejudicial. Zheng's argument regarding the alleged prejudice rests on his belief that "[t]here is strong public sentiment against illegal immigration in this country," especially in light of the September 11th attacks. Zheng cites no authority that would apply this generalized contention to his own case.

The government reasonably argues that the immigration arrest and the counterfeit charges arose from a "single criminal episode."[9] *Freeman*, 434 F.3d at 374 (internal quotation omitted). The government similarly contends that the jury was entitled to know the full context of Zheng's arrest, including why the arresting officer in this counterfeiting case was an immigration enforcement agent. Prior to trial, in denying Zheng's *in limine* motion, the district court agreed to allow the prosecutor to mention Zheng's immigration status as the reason he was arrested. The district court did so because, at the time of the arrest, no warrant had been issued for Zheng in connection with the

illegally in the United States. The examinations of Agents Lopez and Liu substantiated the government's opening statement.

[9]The government separately argues that Zheng's immigration violation is the functional equivalent of committing fraud on immigration authorities, which then is similar to Zheng committing fraud on the manufacturers of the infringed items. The government's attempt to connect the intent to illegally remain in the United States after the expiration of a visa with the intent to traffic in counterfeit goods is particularly weak. The government does not, and indeed cannot, cite caselaw in support of its theory that the fraudulent intents are identical, or even related.

counterfeiting charges, and he was initially taken into custody on the immigration violation. Under this view, Zheng's immigration status would be intrinsic evidence not subject to Rule 404(b).

Even applying Rule 404(b), though, the evidentiary admission does not require reversal. While Zheng's status as an illegal alien does not enjoy strong relevancy, any prejudice from the evidence was insubstantial. Some "hallmarks of highly prejudicial evidence" include "violent acts," acts "greater in magnitude" than the charged crimes, and acts that "occupy more of the jury's time than the evidence of the charged offenses." *Hernandez-Guevara*, 162 F.3d at 872 (citing *United States v. Fortenberry*, 860 F.2d 628, 632 (5th Cir. 1988)). During voir dire, the district court extensively warned jurors against potential prejudice or bias. During the government's closing argument, the district court sustained Zheng's objection when the government mentioned Zheng's immigration status and gave a limiting instruction to the jury, ordering it to disregard the government's comment. We presume that the district court's instructions limited, if not eliminated, any prejudicial effect. *See Adair*, 436 F.3d at 527 ("[T]he district court mitigated any prejudicial effect by giving the jury a limiting instruction."). Ultimately, it cannot be said that introduction of Zheng's immigration status is the type of information that is "of a heinous nature, likely to incite the jury to an irrational decision." *United States v. McMahon*, 592 F.2d 871, 876 (5th Cir. 1979). Accordingly, even if the district court abused its discretion, which we hold it did not, the lack of identifiable prejudice defeats Zheng's argument in favor of reversing his convictions.

**(4)     Bribery Allegation**

At trial, Agent Liu testified that Zheng offered a $50,000 bribe if Agent Liu would allow him to escape. Zheng contends that the district court's decision to permit Agent Liu to testify to the uncharged attempted bribery violates FED. R. EVID. 404(b). We conclude it does not.

-12-

In *United States v. Posey*, citing Rule 404(b), this court held that evidence of a post-arrest attempted bribe of an arresting officer is permissible to establish guilt of the underlying crime charged. 611 F.2d 1389, 1391 (5th Cir. 1980) ("The trial court admitted testimony that on his way to jail [the defendant] offered a county sheriff $100,000 to let him out of the car. This attempt to bribe a government official in order to escape shortly after arrest was clearly admissible as evidence of guilt."). *See also United States v. Paccione*, 949 F.2d 1183, 1199 (2d Cir. 1991) ("These statements by [the defendant], which the jury was plainly free to interpret as offering bribes, were relevant to show a consciousness of guilt . . . and thereby to cast doubt on his lack-of-intent defense."); *United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986) (collecting cases and citing *Posey*). Here, Zheng's main argument, on appeal as at trial, is that he did not know the goods were counterfeit. His bribery attempt is relevant and highly probative of intent, knowledge, and absence of mistake. Since the bribery attempt was properly admitted under Rule 404(b), the district court did not abuse its discretion in failing to exclude it.

## C. Hearsay Objections

### (1) Standard of Review

As previously discussed, a district court's evidentiary decisions are reviewed for abuse of discretion. *Cantu*, 167 F.3d at 203. Such decisions include admission of out-of-court statements under Rule 801(d)(2)(D). *United States v. Sudeen*, 434 F.3d 384, 390 (5th Cir. 2005). Even if the reviewing court holds that the district court abused its discretion, the decision is reviewed for harmless error. *United States v. Ragsdale*, 426 F.3d 765, 774–75 (5th Cir. 2005); *United States v. Summers*, 598 F.2d 450, 459 (5th Cir. 1979) (employing harmless error analysis in refusing to reverse a conviction even though the district court erred under Rule 801(d)(2)(D)).

**(2)     Anna's Statements**

At trial, Agent Irwin testified that "Anna," an XYZ employee, made several statements tending to show that Anna knew the goods at issue were not of regular merchantable quality. Zheng objected, arguing that the statements were testimonial hearsay inadmissible under *Crawford v. Washington*, 541 U.S. 36 (2004). The government argued in favor of admissibility under Rule 801. The district court, relying on Rule 801(d)(2)(D),[10] overruled the objection "on the basis that the statement is not hearsay because . . . the statement is one that this party, who is an agent of your defendant, is permitted to make and permitted to make within the scope of her employment."

Assuming that Rule 801(d)(2)(D) survived *Crawford*,[11] the district court did not abuse its discretion in admitting Agent Irwin's testimony regarding Anna's statements. Anna's statements fall squarely within Rule 801(d)(2)(D) and are admissible non-hearsay. Assuming, however, that *Crawford*-type error occurred, we must determine whether any constitutional error resulting from admitting Anna's statement was harmless.

> To determine whether the [Confrontation Clause] error was harmless, "we consider the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and of course, the overall strength of the prosecution's case."

---

[10]Rule 801(d)(2)(D) states:
> A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship. . . . The contents of the statement shall be considered but are not alone sufficient to establish the declarant's . . . agency or employment relationship and scope thereof. . . .

[11]Without scrutinizing the implications of *Crawford*, at least one post-*Crawford* case in this circuit has upheld a district court's admission of statements under Rule 801(d)(2)(D). *See, e.g.*, *Sudeen*, 434 F.3d at 390–91.

*United States v. Edwards*, 303 F.3d 606, 623 (5th Cir. 2002) (quoting *Hafdahl v. Johnson*, 251 F.3d

528, 539–40 (5th Cir. 2001)).  Anna's statements spoke directly to her own knowledge, not to

Zheng's, of the inferior quality of some of the goods sold at XYZ.  The statements only corroborated

the other physical evidence tending to show that the counterfeit items were visibly inferior to the

actual items.  Since Agent Irwin's testimony regarding Anna's statements was not particularly

important to the government's case, was cumulative to other evidence, and was corroborated by

other evidence, any error in admitting the testimony was harmless.

**(3)     Reference to Terrorism**

When describing how consumers are harmed by counterfeit goods, Gillette's trademark

counsel testified about how counterfeit goods hurt consumers generally:

> Well, [consumers a]re not getting the benefit of their bargain, certainly.
> They're not buying what they expect to get.  They're not getting any backup from the
> company if, in fact, something is problematic with the product.  The product has a
> likelihood that it's a health, safety or an environmental hazard.
>      In the case of batteries, batteries typically that are counterfeited contain
> mercury that's been subsequently added in, which is a health and environmental
> hazard.  They, also, are not typically made to proper specifications.  They are not
> vented.  They are an explosion hazard typically.
>      In addition, you're hurt by  - - taxes are not being paid by people who are
> dealing with counterfeiters; so, your taxes are going to be increasing.  Evidence is
> increasing[ly] clear that the source of counterfeits is a money source for organized
> crime in terrorism.  These ties have been made through - - mostly in the U.S.
> Congress through Interpol testimony.  So, there is [sic] a lot of reasons why it's not
> a victimless crime.

Zheng immediately objected at trial on both hearsay and relevancy grounds.  The district court

overruled the objection, and the prosecutor moved on to another question without further comment.

On appeal, Zheng contends that this terrorism reference, in the current "War on Terror" climate, is

so prejudicial as to require reversal.  Zheng cites no authority in support of his conclusory contention.

As the government notes, and as a review of the transcript proves, nowhere else in the trial

-15-

did anyone reference terrorism; the government did not reference it even in closing arguments. The entirety of this small portion of the witness's testimony, furthermore, shows that the witness was listing general reasons why counterfeiting hurts consumers. The witness discussed health, safety, environmental, and tax reasons before mentioning a possible terrorism connection. At no point did the witness attempt to connect Zheng specifically with international terrorism or conclude that sales of Chinese counterfeits in particular aid terrorists. Assuming that the district court abused its discretion in allowing the testimony, Zheng fails to show any prejudice from the isolated comment.

**D.     U.S.S.G. § 2B5.3**

Since we vacate a conviction that contributed to Zheng's sentence, we necessarily must remand this case for resentencing. With that fact in mind, it is not strictly necessary for us to review any other sentencing errors. Nonetheless, to prevent the district court from again erroneously applying the guidelines on remand, we address Zheng's sentencing arguments as they relate to the five counts of conviction we affirm. *See United States v. Murillo-Lopez*, 444 F.3d 337, 339 (5th Cir. 2006) (addressing additional sentencing issues "[i]n the interest of judicial efficiency and to provide guidance on remand").

**(1)     Standard of Review**

After *Booker*, just as before, this court reviews de novo the district court's interpretation and application of the Sentencing Guidelines. *United States v. Villegas*, 404 F.3d 355, 359 (5th Cir. 2005). The district court's factual findings are reviewed for clear error. *Gonzales*, 436 F.3d at 584. "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole." *Id.* (internal quotation omitted).

**(2)     Infringement Amount**

U.S.S.G. § 2B5.3(b)(1) requires the district court to increase a defendant's base offense level pursuant to the "infringement amount."[12] The infringement amount is the retail value of the *infringing* item (*i.e.*, the sale price of the counterfeit item itself), except in certain enumerated situations that call for using the retail value of the *infringed* item (*i.e.*, the sale price of the legitimate item whose sales the counterfeit item seeks to usurp). *See* U.S.S.G. § 2B5.3 cmt. n.2(A), (B). Here, the retail value of the infringed item could be used if:

> (i) The infringing item . . . is, or appears to a reasonably informed purchaser to be, identical or substantially equivalent to the infringed item . . . .
>
> (ii) The retail price of the infringing item is not less than 75% of the retail price of the infringed item.
>
> (iii) The retail value of the infringing item is difficult or impossible to determine without unduly complicating or prolonging the sentencing proceeding.
>
> . . .
>
> (v) The retail value of the infringed item provides a more accurate assessment of the pecuniary harm to the copyright or trademark owner than does the retail value of the infringing item.

U.S.S.G. § 2B5.3 cmt. n.2(A).

In calculating Zheng's sentence, the district court applied the retail value of the infringed items as the infringement amount. Though the district court did not specifically identify which commentary subsection it believed supported using the infringed item value, a review of the transcript leads us to believe that the district court drew its rationale from the final enumerated situation, when the infringed item value provides a more accurate assessment of the trademark owner's pecuniary harm.

At trial, believing that the value of the infringed item was the proper amount in need of

---

[12]The district court properly used the 2003 version of the guidelines.

-17-

determination, the district court prohibited Zheng from cross-examining Agent Palestina, the government's pricing specialist, on the retail value of the counterfeit goods. Further, for purposes of a supplemental finding, the district court instructed the jury that the "'infringement amount' is the retail value of the infringed item." At sentencing, after Zheng's counsel again objected, the district court concluded that the value of the infringed items should be used: "So the point is not one of real value . . . as much as it is a look to see what the mark is worth when it's placed on an item that might be totally worthless. . . . [S]omething worthless becomes worth something at the point that the reputation of someone else is attached to it."

No prior decision from this or, to our knowledge, any other circuit addresses a situation in which the district court uses the "pecuniary harm" guideline commentary, over a defendant's objection, to justify using the retail value of the infringed items. Nonetheless, the government places strong emphasis on this court's decision in *United States v. Kim*, 963 F.2d 65 (5th Cir. 1992). *Kim* involved the 1990 version of § 2B5.3's predecessor, § 2B5.4, which required the district court to use the "retail value of the infringing items" (there, fake Gucci, Louis Vitton, and Rolex items). The district court erroneously concluded that the term "infringing items" meant the brand-name items, not the counterfeit items. *Id.* at 68. This court noted the error, holding that "infringing items" unambiguously referred to the counterfeit items. *Id.* However, this court concluded that the district court did not clearly err by using the infringed item value as an *estimate* of the infringing item value. *Id.* at 66, 69.

As opposed to the facts of *Kim*, the district court here did not use the infringed item value as an estimate of the infringing item value; rather, the district court explicitly determined that the infringed item value was the proper one to use for purposes of guideline calculations. Additionally,

the *Kim* court focused on the fact that the defendant "made no attempt to submit evidence of the retail value of the infringing items," and, therefore, no other record evidence gave the value of the infringing item. *Id.* at 68. Zheng, however, clearly attempted to put the infringing items' retail values before the jury, but was prevented from doing so by the district court. Therefore, *Kim* simply does not support the government's position, nor the district court's decision.

The lack of record evidence on pecuniary harm to the victim companies weighs against the district court's decision to use the infringed item value. The statute under which Zheng was convicted permits the victim companies to submit victim impact statements to identify "the extent and scope of the injury and loss suffered by the victim, including the estimated economic impact of the offense on that victim." 18 U.S.C. § 2320(d)(1). However, as Zheng noted at sentencing, the victim companies failed to respond to the probation officer's request for victim impact statements. Additionally, though the jury made a supplemental finding that Zheng's offenses "involve substantial harm to the reputation of the copyright or trademark owners," the district court apparently did not take this supplemental finding into consideration in deciding to use the infringed item value; indeed, the district court expressly denied a government-requested upward departure based on the supplemental finding, implicitly signaling that the pecuniary harm to the victims, like the reputational harm, was insubstantial.[13] In sum, it is not at all clear on which record evidence, if any, the district court based its assessment that the infringed item value provides a more accurate assessment of the pecuniary harm to the trademark owners.

The other enumerated situations permitting use of the infringed item value would not support the enhancement based on the record evidence. *See* U.S.S.G. § 2B5.3 cmt. n.2(A). As detailed

---

[13]USSG § 2B5.3 cmt. n.5(A) permits an upward departure for the reasons found by the jury.

above, one enumerated situation is when the infringed and infringing items appear virtually indistinguishable to a reasonably informed purchaser. The government's own evidence, however, shows that not to be the case for, at least, the batteries, and the Spider-Man phones and figures.[14] Another enumerated situation is when the retail value of the infringing item is not less than 75% of the retail value of the infringed item. However, the limited testimony that the district court permitted shows that this provision is inapplicable for, at least, the batteries, the flashlights with the batteries, and the extension cords, all of which sold for between sixty-five cents and $1.25. Had the district court permitted Zheng to cross-examine Agents Irwin or Palestina on the value of the infringing items, it is likely that the other items would have been shown to have similarly low retail values; XYZ, after all, is a discount retail store. The only other possibly applicable enumerated situation is when the retail value of the infringing item is difficult or impossible to determine. However, as just mentioned, the retail values of many of the infringing items were not only known to the government but presented at trial. The retail value of the remaining infringing items could have been discovered readily by the probation officer developing the PSR, or Zheng could have presented such evidence at sentencing with the district court's indulgence, since those items mainly were for sale at Zheng's store prior to his arrest.

Ultimately, this court is left with a situation in which the district court found that the retail value of the infringed item provided a more accurate assessment of the pecuniary harm to the trademark owners, but apparently did not base its finding on any facts in the record. Therefore, the

---

[14]The batteries included with the flashlight were "damaged, leaking or crushed." The "C" Dinacell batteries had a "sloppily made" power-checking feature. Marvel does not make or license Spider-Man phones. For the Spider-Man figures, the packaging was deficient and "[t]he colors aren't in the right place. The shape is bad. The quality is very poor. . . . [T]his would come apart quite easily and perhaps not be safe."

district court's factual finding is implausible in light of the entire record and is clearly erroneous. Accordingly, we vacate Zheng's sentence and remand to the district court for resentencing. *See Gonzales*, 436 F.3d at 584.

**(3)** **Risk of Bodily Harm**

We decline to reach the question of whether the district court erred in enhancing Zheng's sentence based on a finding, pursuant to U.S.S.G. § 2B5.3(b)(4), that the counterfeit goods involved "the conscious or reckless risk of serious bodily injury." In light of Zheng's argument on appeal, we merely note that, should the district court, on remand, choose again to apply the enhancement, it should clarify the basis of the decision.

### III. CONCLUSION

We AFFIRM Zheng's convictions as to five counts of trafficking in counterfeit goods. We VACATE his conviction for trafficking in counterfeit Nike sandals. We further VACATE his sentence and REMAND for resentencing, both in light of the vacatur of one count of conviction and the district court's error in interpreting and applying U.S.S.G. § 2B5.3(b)(1).