# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 29, 2011

No. 10-20354

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

EHAB ASHOOR,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas
No. 4:09-CR-307-1

Before DAVIS, CLEMENT, and ELROD, Circuit Judges.

PER CURIAM:[*]

Ehab Ashoor entered into a contract with the Marines to sell them 200 genuine Cisco network cards at an average of $595 per card. Instead of purchasing these cards from a Cisco distributor, Ashoor purchased the 200 network cards from an Ebay vendor in China at $25-26 each. These cards were intercepted en route to Ashoor's residence in Houston and confirmed to be counterfeit. Ashoor was indicted and convicted of trafficking in counterfeit goods under 18 U.S.C. § 2320(a). He appeals the district court's rulings on his motion

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-20354

in limine and his motion for judgment of acquittal. For the following reasons, we **AFFIRM**.

## I.    Facts and Proceedings

Ehab Ashoor owned and operated CDS Federal, a business in Houston, Texas. Ashoor and CDS Federal were authorized resellers in the "Cisco Registered Partner Program" ("Program"). Cisco operates the Program as its primary means of distributing its products, selling ninety percent of its products through the Program. Authorized Cisco resellers are contractually obligated to only sell Cisco products purchased from a list of authorized distributors who, in turn, obtain their Cisco products directly from the company. The purpose of the Program is to ensure that end users buy genuine Cisco products. In return, end users who purchase from Cisco authorized resellers receive warranties and can purchase enhanced customer support from Cisco.

Prior to starting CDS Federal, Ashoor had previously worked in sales at another Texas company called PC Vision. PC Vision was a Cisco authorized reseller. In 2004, PC Vision, through Ashoor, sold the City of Houston ("City") some Cisco network products. The City subsequently discovered that PC Vision had not purchased the networking products from a Cisco authorized distributor. Because PC Vision had violated its contractual obligation to sell only Cisco products purchased from authorized distributors, Cisco terminated PC Vision's contract and removed PC Vision from the Program. Cisco did not determine if PC Vision had sold counterfeit network products to the City.

In June 2008, the Marine Corps, looking to establish a computer network in Iraq, posted a request for bids on two contracts to provide 100 network cards, specifically gigabyte interface converters ("GBICs"). The Marines requested genuine Cisco GBICs because they previously had experience with counterfeit cards that provided inferior performance. Ashoor submitted bids for the contracts, quoting a price of $695 per unit for one set of 100 Cisco GBICs and

2

No. 10-20354

$495 per unit for the other set, for a total price of $119,000. After receiving express assurances from Ashoor that he would provide genuine Cisco products, the Marines awarded CDS Federal the contracts.

After he was awarded the contracts, Ashoor turned to Arbitech, a company known to have sold counterfeit Cisco products in the past. Ashoor contacted Arbitech and requested a quote for 200 Cisco GBICs. The Arbitech salesperson declined, stating that "Cisco is risky selling to the government due to rep involvement." Arbitech instead offered to sell Ashoor non-Cisco brand GBICs.

After he was rebuffed by Arbitech, Ashoor turned to Ebay. Ashoor contacted an Ebay seller named "Jason Sun," requesting a quote for "genuine" Cisco parts. Sun declined to sell Ashoor any parts, stating that "Sorry, you should be aware that[] all the Cisco parts you bought from China and Hong Kong sellers are not original. All these parts are made by a third party."

Ashoor finally found Ingellen, a seller in Hong Kong. Ingellen had posted an Ebay ad offering "10 pieces new bulk" GBICs for sale. The advertisement did not state that it was offering Cisco parts and Ingellen is not a Cisco authorized distributor. Ashoor contacted Ingellen specifying that he wanted 200 GBICs without specifying that he wanted Cisco genuine parts. In response, Ingellen asked Ashoor to supply an "exact order and which package you need." Ashoor replied, stating: "We prefer each GBIC should be in Cisco packaging." On July 21, 2008, Ashoor purchased 200 GBICs from Ingellen at $25-26 per unit and $400 in shipping costs, for a total of $5,500. Genuine Cisco GBICs cost approximately $600-700 each when purchased from a Cisco authorized distributor. As part of his shipping instructions, Ashoor specifically requested individual (and not bulk) packaging.

Ingellen shipped the GBICs, but the package was intercepted by Customs Inspector Dan Nugent in Chicago, Illinois on July 28, 2008. Suspecting that the Cisco parts were counterfeit, Nugent took photographs of the components and

forwarded the pictures to Cisco. Nugent also informed Immigration and Customs Enforcement ("ICE") Agent Corbin Wickman that he had encountered a package of suspected counterfeit items. The next day, Cisco informed Nugent that one of the components in the package was "non-genuine" because its serial number did not exist in Cisco's database. Nugent seized the package.

After receiving the tip from Nugent, Wickman contacted and interviewed Ashoor. During the interview, Ashoor stated that he had purchased the 200 GBICs on Ebay and that he had paid $50 per unit for the GBICs. Ashoor also stated that he knew that Cisco authorized resellers were contractually required to purchase from authorized distributors and that he would have paid $300-400 per unit if he had purchased the GBICs through a Cisco authorized distributor.

Ashoor was arrested and charged with trafficking in counterfeit goods, in violation of 18 U.S.C. § 2320(a). At trial, the Government introduced testimony under Federal Rule of Evidence 404(b) showing that Cisco had previously excluded PC Vision (and Ashoor) from the Program. The government argued that the evidence was probative of Ashoor's "knowledge and absence of mistake concerning the Cisco Registered Partner Program and the significant risk that purported Cisco products purchased outside that network may be counterfeit." Ashoor did not object to the introduction of this evidence. At the close of evidence, Ashoor filed a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29, which the district court denied. On January 15, 2010, the district court declared a mistrial because the jury could not come to a unanimous verdict. The court immediately scheduled a second trial.

On January 18, 2010, Ashoor filed an Opposed Motion in Limine to bar the Government and witnesses from making any reference to Ashoor's involvement in PC Vision's removal from the Program. Ashoor argued that his activities at PC Vision were inadmissible extrinsic evidence of prior bad acts under both Federal Rule of Evidence 404(b) and this court's opinion in *United States v.*

4

*Beechum*, 582 F.2d 898 (5th Cir. 1978). Ashoor specifically requested that the district court "articulate on the record its findings as to the Beechum probative value/prejudice evaluation." The next day, Ashoor's second trial began. Before voir dire, the district court explicitly adopted all of its rulings from the first trial. Ashoor then asked about the motion in limine. The district stated that "my prior rulings hold, including [the] 404(b)" ruling. At the close of evidence, Ashoor reurged his motion for judgment of acquittal; the district court again denied the motion.

On January 22, 2010, the jury found Ashoor guilty. Ashoor filed a motion for a new trial in which he renewed his motion for judgment of acquittal. The district court denied this motion and sentenced Ashoor to 51 months' imprisonment. Ashoor timely appealed.

## II. Discussion

### A.    Admission of Evidence under Federal Rule of Evidence 404(b)

Ashoor argues that the district court erred by admitting evidence of his prior expulsion from the Program under Rule 404(b) without making the requested on-the-record *Beechum* findings. He argues that the evidence carries "little probative value as to whether or not Mr. Ashoor knew he was purchasing counterfeit goods in June of 2008" and that it "served more to mislead the jury into believing that goods purchased outside of the authorized sources are counterfeit, when there was no evidence to support that conclusion."[1]   The

_____

[1] Although Ashoor notes that there is "substantial uncertainty as to the correctness" of the district court's ruling, he does not argue that the court abused its discretion in admitting the evidence. Even if we were to broadly construe Ashoor's argument to include an attack on the merits of the district court's decision, this claim would fail. This court reviews a district court's decision to admit or exclude evidence under 404(b) for abuse of discretion. *United States v. Yi*, 460 F.3d 623, 631 (5th Cir. 2006). As discussed below, the district court correctly admitted the evidence because the probative value of the evidence outweighed its minimal prejudicial effect.

No. 10-20354

district court undisputedly failed to make on-the-record findings when it denied Ashoor's motion in limine.

Rule 404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

In *Beechum*, we held that Rule 404(b) mandates that the trial court engage in a two-step analysis: "First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403." 582 F.2d at 911. Furthermore, we have generally required "an on-the-record articulation by the trial court of *Beechum*'s probative value/prejudice inquiry when requested by a party." *United States v. Robinson*, 700 F.2d 205, 213 (5th Cir. 1983). A district court's failure to make on-the-record findings and conclusions necessitates remand "unless the factors upon which the probative value/prejudice evaluation were made are readily apparent from the record, and there is no substantial uncertainty about the correctness of the ruling." *Id*.

We hold that the district court's Rule 404(b) ruling falls squarely in the exception described in *Robinson*. First, the record clearly shows the factors upon which the district court based its probative value/prejudice evaluation. The Government filed an extensive Rule 404(b) motion before the first trial, arguing that evidence of Ashoor's activities at PC Vision was "highly probative of Ashoor's knowledge and absence of mistake concerning the Cisco Registered

Partner Program and the significant risk that purported Cisco products purchased outside that network may be counterfeit." It also argued that introducing the information would not be prejudicial because "purchasing products outside of a company's official network is not the type of conduct that is inherently inflammatory." Ashoor argued in his motion in limine that Ashoor's exclusion from the Program for purchasing goods from unauthorized distributors carried "little probative value as to whether or not Mr. Ashoor knew he was purchasing counterfeit goods in June of 2008." He argued that the information was prejudicial because "the jury might be mislead [sic] into believing that the previous violation of Cisco's rules put Mr. Ashoor on notice that counterfeit products would be purchased if sourced from outside the program's distribution network." The district court's explicit reference to the first trial in denying Ashoor's motion in limine indicates that it based its probative value/prejudice evaluation on the arguments presented by the Government's first motion and Ashoor's motion in limine.

Second, there is no substantial uncertainty about the correctness of the district court's decision to admit the evidence. Ashoor argues that the evidence of his 2004 expulsion from the Program carried little probative value as to whether he knew that he was purchasing counterfeit goods in 2008 because there was no evidence presented (1) that Ashoor purchased counterfeit goods in 2004 or (2) that goods purchased outside the Program are always counterfeit. But the Government presented evidence that the Program was intended to ensure that Cisco resellers sell genuine products and that there was a "thriving" market for counterfeit Cisco products. Thus, even if Ashoor did not purchase counterfeit goods in 2004, the proffered evidence was probative of his knowledge of: (1) how to get authorized, non-counterfeit, products; (2) the fact that a product purchased outside of the Program *may* be counterfeit; and (3) the price of genuine Cisco products. Presented with this knowledge, the jury could infer

No. 10-20354

that Ashoor knew that he was purchasing counterfeit goods when he purchased Cisco network cards outside of the Registered Partner Program at less than ten percent of the price of genuine products.

Further, the potential prejudicial effect of the evidence is low. Evidence of Ashoor's expulsion from the Cisco Registered Partner Program "is not of a heinous nature; it would hardly incite the jury to irrational decision by its force on human emotion." *Beechum*, 582 F.2d at 917. This evidence "was no more likely to confuse the issues, mislead the jury, cause undue delay, or waste time than any other type of extrinsic offense evidence." *Id.* Because "the factors upon which the probative value/prejudice evaluation were made are readily apparent from the record, and there is no substantial uncertainty about the correctness of the ruling," *Robinson*, 700 F.3d at 213, we decline to remand the case for on-the-record *Beechum* findings.

B.     Ashoor's motion for judgment of acquittal

1.     Standard of Review

We review "*de novo* the denial of a Rule 29 motion for a judgment of acquittal." *United States v. Xu*, 599 F.3d 452, 453 (5th Cir. 2010). In determining if there was sufficient evidence to support a conviction, the "relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Valle*, 538 F.3d 341, 344 (5th Cir. 2008) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (internal quotation marks omitted) (emphasis in original). We draw all reasonable inferences and make all credibility determinations in the light most favorable to the verdict. *United States v. Villarreal*, 324 F.3d 319, 322 (5th Cir. 2003).

2.     18 U.S.C. § 2320(a)

No. 10-20354

18 U.S.C. § 2320(a) punishes "[w]hoever intentionally traffics or attempts to traffic in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services." To prove a violation of the statute, the government must establish that:

> (1) the defendant trafficked or attempted to traffic in goods or services; (2) such trafficking, or the attempt to traffic, was intentional; (3) the defendant used a counterfeit mark on or in connection with such goods or services; and (4) the defendant knew that the mark so used was counterfeit.

*United States v. Yi*, 460 F.3d 623, 629 (5th Cir. 2006) (quoting *United States v. Hanafy*, 302 F.3d 485, 487 (5th Cir. 2002)).

Ashoor concedes (1) that he trafficked in goods and (2) that he intended to traffic in goods. He argues that the evidence was insufficient to show (3) that he "used" the counterfeit marks on the GBICs he purchased or (4) that he knew that the marks on the GBICs were counterfeit.

a.      Whether Ashoor "used" Cisco's mark

Ashoor argues that the evidence did not show that he "used" Cisco's trademark. He argues that there was no evidence that: (1) he placed the marks on the GBICs himself; (2) he had a prior relationship with Ingellen suggesting that they normally used Cisco's mark in their dealings; or (3) he directed Ingellen to use Cisco's mark. To support his third point, he argues that he "merely requested to purchase Cisco products from an online vendor purporting to sell such products," and that "[a]t no time did he ever indicate that a Cisco trademark should be placed on the products." Although he acknowledges that "he did request Cisco packaging," he notes that "this request came after the vendor asked him how he would like the products packaged."

Ashoor's argument fails because his proposed definition of "use" in § 2320 is too narrow. This court has never held that "use" under § 2320(a) requires the Government to prove that a defendant actively placed the counterfeit marks on

9

the goods himself or that he directed a vendor to place the marks on the goods. On the contrary, this court has upheld convictions under § 2320 where the defendant had no role in the manufacture or labeling of the counterfeit goods. *See, e.g.*, *Yi*, 460 F.3d at 630 (affirming § 2320(a) conviction for store owner who imported counterfeit goods); *United States v. Garrison*, 380 F. App'x 423, 424-26 (5th Cir. 2010) (same); *United States v. Dahab*, 348 F. App'x 943, 944-45 (5th Cir. 2009) (same). In *United States v. Diallo*, the Third Circuit addressed the term "use" in § 2320 and held that the jury could find that Diallo "used" handbags with counterfeit "LV" (Louis Vuitton) labels when he was transporting the bags to his store to sell. 575 F.3d 252, 261-62 (3d Cir. 2009). Thus, "Diallo admitted that the handbags, which bore the counterfeit 'LV' logos, were for his store in Indianapolis. Though packaged in plastic bags during transit, the marked handbags were part of Diallo's inventory and he was able to enjoy the benefits of the counterfeit 'LV' marks that were on the handbags." *Id.* at 262.

Here, there was ample evidence for the jury to find that Ashoor "used" the Cisco mark. The GBICs that he ordered were undisputedly non-Cisco network cards individually packaged with Cisco's logo. Although Ashoor had not received the GBICs, they were part of his inventory and he planned on enjoying the benefits of the counterfeit "Cisco" marks on the GBICs—by selling the parts to the Marines at over 2,000% profit.

Furthermore, there was substantial evidence that Ashoor "used" Cisco's mark by directing Ingellen to put the marks on the GBICs. The government presented evidence that Ashoor purchased the GBICs from Ingellen in response to an Ebay ad advertising *bulk* GBICs without specifying that the parts were Cisco genuine parts (the ad did not specify which brand the parts were). The Ingellen representative did not mention Cisco in any way until Ashoor specified that "[w]e prefer each GBIC should be in Cisco packaging." After receiving an invoice, which did not mention that he was purchasing Cisco products, Ashoor

asked the Ingellen representative "What will the packing [sic] for these items? We need these (individual) 200 pieces in a CISCO sealed bag." The Cisco trademark consists of the company name in all capital letters. Furthermore, Cisco does not typically sell its products in bulk. Ingellen subsequently shipped Ashoor counterfeit GBICs individually packaged with the Cisco logo. A jury could easily infer from this evidence that Ashoor instructed Ingellen to place the Cisco trademark on the GBICs as part of his packaging instructions. There was sufficient evidence to support the jury's finding that Ashoor "used" Cisco's mark as required for conviction under 18 U.S.C. § 2320(a).

b.      Whether Ashoor knew that the GBICs were counterfeit

Ashoor also argues that the evidence did not show that he knew that the GBICs were counterfeit. He argues that "[b]y never receiving, possessing, or even seeing the goods and the spurious mark and with no other indication from the vendor that the mark would be counterfeit, [he] had no way of knowing the mark used was indeed counterfeit."

We disagree. There was ample evidence by which a jury could conclude that Ashoor knew that the GBICs he ordered were counterfeit, even though he had never seen the network cards. Ashoor indisputably ordered the GBICs and knew that the shipment contained GBICs in Cisco individual packaging. The jury could easily infer that Ashoor knew the parts were counterfeit because he was purchasing them at a dramatically lower price than genuine parts purchased from an authorized distributor ($25-26 compared to $600-700). Further, a jury could also infer Ashoor's knowledge of the counterfeit nature of the GBICs from: (1) the fact that he responded to an ad for *bulk* GBICs and asked for the parts to be *individually* packaged, even though Cisco does not sell parts in bulk; (2) the fact that he first attempted to purchase the GBICs from a known counterfeiter who refused to sell him the products due to "rep involvement"; and (3) the fact that he was warned that parts from China were

likely to be counterfeit.   Because there was sufficient evidence to support Ashoor's conviction under 18 U.S.C. § 2320(a), the district court properly denied Ashoor's Rule 29 motion for a judgment of acquittal.

## III.   Conclusion

For the foregoing reasons, we **AFFIRM** Ashoor's conviction.