[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 9, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-11136

_____

D. C. Docket No. 04-20817-CR-KMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HERMAN ALBERTO LOZANO,
a.k.a. Alberto Cubillos,
a.k.a. Cubillos A. Hermann,

Defendant-Appellant.

_____

No. 06-11137

_____

D.C. Docket No. 04-20817-CR-KMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

XAVIER DARIO LOZANO,
a.k.a. Javer Lozano,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

**(July 9, 2007)**

Before CARNES and WILSON, Circuit Judges, and STAGG,[*] District Judge.

STAGG, District Judge:

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Suplimet Corporation was a Miami-based company acting as a wholesale distributor of cell phone parts and accessories.  In January of 2003, police received information that Suplimet was selling counterfeit items, and on that basis, conducted a controlled purchase of counterfeit cell phone parts.  Following the purchase, the authorities requested permission to search Suplimet's warehouse.  Xavier Lozano, who was present, advised police that he could not authorize a search, as he was only Suplimet's sales manager.  Instead, he contacted his brother Herman, the owner of Suplimet, for permission to search and obtained Herman's consent.  The search yielded forty-one boxes of counterfeit goods.  However, no criminal charges were filed at this time.[1]

_____

[*] Honorable Tom Stagg, United States District Judge for the Western District of Louisiana, sitting by designation.

[1] Additionally, in August of 2003, United States Bureau of Immigration and Customs Enforcement agents seized forty-three boxes of counterfeit cell phone parts shipped from China.

During 2004, authorities conducted two controlled purchases of counterfeit cell phone parts from two Miami retailers. They discovered that the counterfeit items originated from Suplimet. In September of 2004, agents purchased fifty counterfeit cell phone batteries from Suplimet. Armed with a warrant, agents again searched Suplimet's warehouse and seized approximately 85,000 pieces of counterfeit cell phone parts. On October 21, 2004, Herman and Xavier were indicted for conspiracy to traffic in counterfeit goods and trafficking in counterfeit goods, in violation of 18 U.S.C. §§ 371 and 2320(a). In May of 2005, both defendants pled guilty.

At the sentencing hearing, both Herman and Xavier agreed that United States Sentencing Guidelines ("U.S.S.G.") § 2B5.3 applied to their sentence calculations. Section 2B5.3 is used to calculate the offense level for a conviction stemming from the counterfeiting and/or infringement of a trademark or copyright. This provision provides for a base offense level of 8, which is then enhanced on the basis of the amount of the infringement, pursuant to U.S.S.G. § 2B1.1.[2] The Presentence Report ("PSR") attributed a loss amount of $10,177,485 to the Lozanos, which resulted in a 20-level enhancement under section 2B1.1. It also

The shipment listed Suplimet as the consignee.

[2] U.S.S.G. § 2B5.3(b)(1)(B) provides that if the infringement amount "exceeded $5,000, increase by the number of levels from the table in § 2B1.1 . . . ."

3

recommended a 2-point enhancement for both Herman and Xavier for their aggravating roles in the offenses, pursuant to section 3B1.1(c). After 3-level reductions for acceptance of responsibility, the total offense level for both defendants was 27. With a criminal history category of I for each defendant, both computations resulted in a recommended sentencing range of 70 to 87 months.

The Lozanos objected to the PSR's recommendation of the 20-level enhancement. Instead, they argued that the correct computations should have reflected the value of the counterfeit or infringing[3] items in the market in which those goods were sold, which in this case was Latin America, as opposed to the Manufacturer's Suggested Retail Price in the United States, which the PSR recommended. Under the Lozanos' calculations, their offense levels would have been 8.

The government, on the other hand, asserted that the retail value[4] of the legitimate or infringed item in the United States was the proper valuation method under section 2B5.3. However, it conceded that the total loss amount should be reduced to $3,700,000, which resulted in an 18-level enhancement, as opposed to

---

[3] "Infringing items" are distinguishable from "infringed items." Infringed items are the legitimate items that are infringed upon by the infringing item. See U.S.S.G. § 2B5.3 at comment. n.1.

[4] Retail value "of an infringed item or an infringing item is the retail price of that item in the market in which it is sold." U.S.S.G. § 2B5.3 at comment. n.2(C).

the 20-level enhancement recommended in the PSR. Agreeing with the government, the district court overruled the Lozanos' objections, finding that the retail value of the infringed items in the United States was the appropriate valuation method because (1) the Lozanos operated a business in the United States, (2) they sold a portion of the counterfeit goods in the United States, and (3) the counterfeit items were seized in the United States. In addition, the court overruled Xavier's objection to the enhancement for his role in the offense. Further, at sentencing the government refused to move for the additional 1-point reduction for acceptance of responsibility; thus, the court only applied a 2-point reduction, rather than the 3-point reduction recommended in the PSR. In all, the total offense level dropped from 27 to 26, which yielded a sentencing range of 63 to 78 months.

After considering the Guidelines range and the factors set forth in 18 U.S.C. § 3553(a), the court sentenced both Herman and Xavier to 72 months. In sentencing Herman Lozano, the court stated:

> Let me just say that also that while I believe that I can sentence within the applicable guideline range and the sentencing guidelines, as they have been considered and calculated, but being aware that the calculation may be subject to challenge, I will want the record also to reflect that I have considered, as I have [said], the factors in 3553, and the sentence that I would impose outside the guidelines in the event the calculation would be successfully challenged.
>
> So, what I am saying is if, for some reason, the calculation is successfully challenged, that I would otherwise sentence outside the

5

guidelines to the same sentence that I am going to announce today as being a guideline sentence.

In sentencing Xavier Lozano, the court made a similar comment:

> With respect to Xavier Lozano, again let me just say that I have considered both the sentence within the guidelines as advisory, as well as the reasonable sentence under 3553 and believe that I can sentence within the guidelines; however, [I am] aware that the guideline sentence may be subject to challenge based on the calculation of the value.
>
> I want the record to reflect that in the event that [] challenge was successful, that I would otherwise sentence outside the guidelines pursuant to the provision of 3553, believing that a seventy-two month sentence would be a reasonable sentence considering each of those factors.

## II. DISCUSSION

We review the district court's factual findings for clear error and the application of the Sentencing Guidelines *de novo*. See United States v. Crawford, 407 F.3d 1174, 1177-78 (11th Cir. 2005). In evaluating the reasonableness of a sentence, we apply a deferential standard in determining whether the sentence imposed serves the purposes of 18 U.S.C. § 3553(a). See United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005).

On appeal, the Lozanos argue that the district court's use of the MSRP created a grossly inflated infringement amount, far beyond the profits they realized or the pecuniary loss they caused the trademark holders to suffer. Instead, they

contend the court should have used the sale price of the counterfeit items in the market in which they were sold-- Latin America-- because the retail value of the trademarked items in the United States market over-represents their culpability. The Lozanos argue that the MSRPs reflect prices above those normally charged for such items. In support of this, they point out that none of the trademark holders submitted a victim impact statement, such that the court had no evidence of pecuniary loss. They further maintain that the prices of the goods in the Latin American market should have been considered, as they intended the products to be sold in that market and the products were much cheaper there. In all, they assert that the court's infringement computation resulted in a fictional loss amount far beyond that actually caused by their fraud. In addition, Xavier asserts that the section 3B1.1 enhancement he received for his role in the offense was improper, as he had no authority or control either in the company or over other employees. Finally, the Lozanos contend that their sentences were unreasonable. We address each of these issues in turn.

## A.    Application Of The Guidelines.

In reviewing a sentence, the court must first determine whether the district court correctly calculated the Guidelines range. The parties disagree about whether the district court properly applied section 2B5.3, which provides that the

infringement amount is the retail value of the infringing item, except in the

following enumerated situations that necessitate use of the infringed item's value:

> (i) The infringing item (I) is, or appears to a reasonably informed purchaser to be, identical or substantially equivalent to the infringed item; . . . or (v) The retail value of the infringed item provides a more accurate assessment of the pecuniary harm to the copyright or trademark owner than does the retail value of the infringing item.

U.S.S.G. § 2B5.3 at comment. n.2(A). The court is directed to use the retail value

of the infringing item in any case not covered by the aforementioned provisions.

Id. at comment. n.2(B).

In the case at bar, the language providing that the infringing item "is, or

appears to a reasonably informed purchaser to be, identical or substantially

equivalent to the infringed item" is critical. The district court found that the

infringing and infringed items were essentially indistinguishable and thus

concluded that use of the retail value of the infringed item was appropriate. We

review this factual finding for clear error, a highly deferential standard.

At the sentencing hearing, Agent Llorca of the United States Bureau of

Immigration and Customs Enforcement testified that it would have required an

expert to recognize that the infringing items were, in fact, counterfeit.

Additionally, a representative from the cell phone company, Nokia, testified that

the counterfeit items being sold by Suplimet appeared to an untrained eye to be

genuine Nokia products. Indeed, she testified that in order to determine the authenticity of many of the items, she had to physically open up the products to view the wiring or construction. Furthermore, a defense witness conceded on cross-examination that the counterfeit items at issue appeared substantially similar to the genuine, trademarked items:

> Q: So, if a Nokia sticker was placed [on] it, it would look just like a Nokia battery?
>
> A: Yes.
>
> Q: We are referring to batteries, chargers, carrying cases, any kind of accessory?
>
> A: They would appear to be similar.
>
> Q: How can you tell the difference, you personally? How do you tell the difference between original Nokia goods and counterfeit Nokia goods or any other trademark?
>
> A: I am unable to distinguish them.

In light of such probative testimony, we cannot say that the district court's findings were clearly erroneous. To the contrary, we hold that use of the retail value of the infringed item, as opposed to the infringing item, was appropriate and supported by the Guidelines.

Nonetheless, the Lozanos contend that use of the infringed item's retail value over-represents their culpability and ignores the "nature and magnitude of

the pecuniary harm." U.S.S.G. § 2B5.3, at comment. backg'd. The Lozanos assert that because the majority of their sales occurred in Latin America-- a market in which the trademark holders did not operate-- the trademark holders thus suffered minimal pecuniary injury. In support of their argument, the Lozanos unconvincingly refer to United States v. Yi, 460 F.3d 623 (5th Cir. 2006).

In Yi, the Fifth Circuit Court of Appeals reversed the district court's use of the retail value of the infringed items because "[t]he lack of record evidence on pecuniary harm to the victim companies weighs against the district court's decision to use the infringed item value." Yi, 460 F.3d at 637. In doing so, it clearly disagreed with the district court's contention that the retail value of the infringed items provided "a more accurate assessment of the pecuniary harm to the trademark owners." Id. Crucial to the Fifth Circuit's reversal of the lower court was the fact that the infringing and infringed items were distinguishable to a reasonably informed purchaser. The same cannot be said in the case at bar. Accordingly, Yi cannot be interpreted to mean that the retail value of the infringing item should always be considered. Rather, based on the specific facts of that case, the Fifth Circuit found inapplicable the enumerated provisions regarding retail value of the infringed item and therefore applied the "catch-all" provision, in which the retail value of the infringing item is used. However, on the facts

10

presented here, it would be inappropriate to follow Yi.

The Lozanos next argue that the district court erred in applying the retail value of the products in the United States, as opposed to Latin America. The parties do not dispute that the retail value of both trademarked and counterfeit items in Latin America is drastically less than the retail value in the United States. However, the Lozanos argue that the court should have used the Latin American market because the majority of Suplimet's sales occurred there. The government asserts that because undercover purchases were made in Miami, the district court correctly used the retail market for the United States. Under section 2B5.3, retail value is defined as the retail price of an item in the market in which it is sold. See U.S.S.G. § 2B5.3 at comment. n.2(C). Here, it is undisputed that the Lozanos sold counterfeit items in Miami. Though they may have shipped the majority of their products to Latin America for sale, that does not render the district court's decision to use the United States market clearly erroneous. To the contrary, use of the products' retail value in the United States was supported by the evidence and appropriate under our reading of the Guidelines.

Next, Xavier argues the court erred by adjusting his offense level upward 2 levels for his role in the offense, pursuant to section 3B1.1. Reviewing for clear error, we find sufficient evidence to support the enhancement. Section 3B1.1(c)

11

provides that "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity," increase by two levels. The enhancement is also appropriate "in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization. U.S.S.G. § 3B1.1 at comment. n.2. "[T]he assertion of control or influence over only one individual is enough to support a § 3B1.1(c) enhancement." United States v. Jiminez, 224 F.3d 1243, 1251 (11th Cir. 2000).

Here, Xavier negotiated the sale of counterfeit products to the undercover agents. Further, he instructed another employee at Suplimet to engage in counterfeit sales. He was in charge of Suplimet, its sales, and its warehouse in Herman's absence. Although he did not have any decision-making authority and did not facilitate the purchase of counterfeit goods from China, Xavier was intricately involved in the offense. Accordingly, the court did not clearly err in applying the 2-level enhancement.

In sum, we find the district court correctly applied the Guidelines and affirm its decision accordingly.

## B. Reasonableness Of The Sentences.

Even were we to find that the district court erred in its application of the

Guidelines, we would affirm the sentences imposed, for we find they are reasonable. The district court made clear that its resolution of the section 2B5.3 issue did not affect the ultimate sentences it gave the Lozanos after considering all of the section 3553(a) factors. As we explained in United States v. Keene, 470 F.3d 1347 (11th Cir. 2006), we can avoid remanding a sentence based on a misapplication of a complicated Guidelines provision "if district courts faced with disputed guidelines issues state that the guidelines advice that results from decision of those issues does not matter to the sentence imposed after the § 3553(a) factors are considered." Id. at 1349. This is so because "'it is not necessary to decide guidelines issues or remand cases for new sentence proceedings where the guidelines error, if any, did not affect the sentence.'" Id. (quoting United States v. Williams, 431 F.3d 767, 775 (11th Cir. 2005) (Carnes, J., concurring)).

Here, the district court told us that if the Lozanos were correct about using the Latin American prices to value the counterfeit phone parts, the court still would have imposed the same 72-month sentences based on its consideration of the section 3553(a) factors. As we said in Keene, "[t]hat is all we need to know, except for one thing." Keene, 470 F.3d at 1349.

The one other thing we need to know is whether the court's sentences were reasonable. See id. "In determining whether [they were] reasonable, we must

13

assume that there was a guidelines error-- that the guidelines should have been decided in the way the defendant[s] argued and the advisory range[s] reduced accordingly-- and then ask whether the final sentence resulting from consideration of the § 3553(a) factors would still be reasonable." Id.

If the district court had decided the section 2B5.3 enhancement issue in the Lozanos' favor, their advisory guidelines range would have been 21 to 27 months, instead of 63 to 78 months. See U.S.S.G. § 2B1.1(b)(1)(E) (the Latin American retail price of the counterfeit parts was $117,000, which yields an 8-level enhancement to the base offense level of 8 for the value of the counterfeit goods); id. ch. 5, pt. A (total offense level of sixteen with criminal history category of I yields an advisory guideline range of 21 to 27 months' imprisonment). The question then is whether the 72-month sentences the court imposed were reasonable, "assuming exactly the same conduct and other factors in the case," but an advisory Guidelines range of 21 to 27 months. Keene, 470 F.3d at 1350.

"Our post-Booker reasonableness review takes into account the § 3553(a) factors as well as the advisory guidelines range." Id. (citing United States v. Booker, 543 U.S. 220, 261, 125 S. Ct. 738, 765–66 (2005)). Our review is "deferential" to the district court, and it is the defendants' burden to establish that their sentences are unreasonable in light of the record and the section 3553(a)

14

factors.  United States v. Valnor, 451 F.3d 744, 750 (11th Cir. 2006).

The district court may determine on a case-by-case basis the relative weight to give the Guidelines range in light of the other section 3553(a) factors.  See United States v. Hunt, 459 F.3d 1180, 1184 (11th Cir. 2006).  "In some cases it may be appropriate to defer to the Guidelines; in others, not.  So long as the district court considers the Guidelines, we do not believe it is appropriate to dictate a 'strength' of consideration applicable to every case."  Id. at 1184–85.

In the instant case, the district court explained that the 72-month sentences were appropriate to "fully reflect[] the seriousness of the offense and . . . afford[] just punishment and deterrents."  We cannot say that this decision was unreasonable.  The Lozanos' counterfeiting operation was as extensive in time as it was costly to the manufacturers.  It lasted five years.  Before other law enforcement agencies finally discovered the Lozanos' illegal activities, customs officials had seized ten shipments of counterfeit cell phone parts headed to Suplimet and the Lozanos between 1999 and 2002.  Despite the seizure of forty-one boxes of counterfeit cell phone parts and accessories in January of 2003, the Lozanos continued to receive shipments of counterfeit material even though they knew that they were under investigation.  Following the January seizure, law enforcement officials seized six more shipments of counterfeit goods to Suplimet,

which included tens of thousands of parts and accessories.

The counterfeiting operation was expansive, expensive, and extensive. The Lozanos, located in Miami, had contacts in China who manufactured and shipped to them the counterfeit phone parts. They then had their father in Colombia sell the counterfeited material to retailers in Latin America. It was an international undertaking.

Given the length, breadth, and depth of the Lozanos counterfeiting scheme, the 72-month prison sentences are not unreasonable. It follows that if there was any error in calculating the retail value of the goods under section 2B5.3, that error did not affect the sentences that were imposed. It was harmless. No purpose would be served by a remand. See Keene, 470 F.3d at 1350.

**AFFIRMED.**

CARNES, Circuit Judge, concurring:

I concur in all of the Court's opinion except for the first six paragraphs of Part II. A. In those paragraphs the Court holds that the district court did not err in its application of U.S.S.G. § 2B5.3(b)(1) by calculating the infringement amount using the retail value in the United States of the infringed item, instead of using the retail value in Latin America of the infringing item. I see no need to decide this issue in order to dispose of the appeal.

The district court explicitly stated that even if it had decided the infringing amount issue the other way, which would have resulted in a lower offense level, it would have imposed the same sentence after considering the 18 U.S.C. § 3553(a) factors. And, as the Court concludes in Part II B. of our opinion, the final sentence is reasonable. That means, under United States v. Keene, 470 F.3d 1347 (11th Cir. 2006), we can affirm regardless of whether the district court was correct in its interpretation and application of § 2B5.3(b)(1). On that basis I concur in the affirmance.

17