[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 17, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-11566

_____

D. C. Docket No. 04-20139-CR-JEM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARIO MELO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(December 17, 2007)**

Before EDMONDSON, Chief Judge, and DUBINA, Circuit Judge, and MARTIN,[*]
District Judge.

PER CURIAM:

---

[*]Honorable Beverly B. Martin, United States District Judge for the Northern District of
Georgia, sitting by designation.

Mario Melo appeals the sentence he received as a result of his plea of guilty to one count of conspiracy to commit money laundering. For the reasons set forth below, we vacate Mr. Melo's sentence and remand to the district court for resentencing.

### I.Background

Mr. Melo, his wife, and others were charged with crimes related to the laundering of drug money. About 15 months after he was first indicted, and just at the time his trial had first been set, Mr. Melo pled guilty to one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and 18 U.S.C. § 1956(h). The remaining charges were dismissed. In connection with pleading guilty, Mr. Melo entered into a written plea agreement with the government. That plea agreement contained no details about the crime to which Mr. Melo pled guilty.

During the plea hearing, however, the Assistant United States Attorney talked about a January 28, 2002 money laundering transaction in which Mr. Melo was involved, as well as a transaction that occurred on August 26, 2003. The entire description of the August 26, 2003 transaction given by the AUSA at the plea hearing was as follows:

During the last transaction, an undercover DEA Task Force agent was in communication with a black market peso broker in Colombia. The broker put the undercover DEA Task Force agent in contact with Mario Melo and his wife, Olga Melo. *They agreed to arrange a pickup of $200,000* (emphasis added).

On August 26th, Mario and Olga Melo drove to a location in the Miami area to pick up an undercover vehicle. At that time Olga Melo entered that undercover vehicle to another location where $200,000 was transferred from the Melos' vehicle to the undercover vehicle.

Olga Melo then drove the undercover vehicle back to the original location. Agents from DEA then retrieved the undercover vehicle and recovered the agreed $200,000 in United States currency.

(Tr. of Change of Pleas Proceeding Before the Hon. Jose E. Martinez, United States District Judge, Oct. 3, 2005 ("Plea Tr.") at 22.) No mention was made of an $800,000 amount associated with this August 23, 2003 transaction.

After Mr. Melo pled guilty, a presentence investigation was prepared and a report was written. Mr. Melo's presentence investigation report ("PSR") referred to his involvement in (1) a transaction which took place on September 24, 2002 and involved $59,800 in laundered funds (PSR ¶ 17); and (2) a transaction which took place on November 8, 2002 and involved $199,120 in laundered funds (PSR ¶ 18). The PSR did not mention what amount of money was associated with the August 26, 2003 transaction, or any details about that transaction. However, it summarily concluded that Mr. Melo should be accountable for laundered funds in the amount of $1,426,010. (PSR ¶ 24.) After applying other adjustments, the PSR

ultimately established a guideline range approaching the statutory maximum term of imprisonment of twenty years under 18 U.S.C. § 1956.[1]

Before he was sentenced, Mr. Melo filed four objections to the PSR. First, he argued that the PSR inappropriately classified him as a leader or organizer of the money laundering scheme. Second, he objected to a paragraph in the PSR that calculated the amount of funds laundered at more than $1,000,000. Third, while he acknowledged that he was aware the money being laundered came from unlawful activity, he asserted he had no knowledge that the funds were narcotics proceeds.[2] Finally, Mr. Melo argued that his criminal history category overrepresented the seriousness of his past crimes and overestimated the probability that he would commit crimes in the future.

------

[1]There is a discrepancy as to the PSR's calculation of Mr. Melo's offense level. The briefs of the parties say that the PSR established Mr. Melo's offense level as a 33, with a criminal history category of V, resulting in a guideline range of 210 to 262 months. However, the PSR in the record before this Court assigns an offense level of 32 to Mr. Melo, with a criminal history category of V, with a resulting guideline range of 188 to 235 months. We note that the paragraphs of the PSR that compute the offense level are inconsistent with the descriptive paragraphs of the PSR. The PSR clearly states that Mr. Melo was a leader or organizer of the crime (PSR ¶ 24), but does not factor in any adjustment for that role. (PSR ¶ 36.) Similarly, the government agreed in the PSR to recommend a 3-level reduction for acceptance of responsibility (PSR ¶ 4), but again, the PSR does not factor that into its computation. (PSR ¶ 40.)

[2]The Addendum to the PSR states "[t]he defendant denies that he knew or believed the laundered funds were proceeds of an unlawful activity." (Addendum to PSR 2.) But this is not consistent with the position taken by Mr. Melo at the time he entered his guilty plea. At that time, Mr. Melo's counsel stated that "Mr. Melo did not know they were narcotics proceeds, but he did know they were from some unlawful activity." (Plea Tr. at 19.)

At sentencing, the United States presented evidence of Mr. Melo's involvement in the money laundering conspiracy. The government called the following witnesses: (1) Mr. Ivan Tabares, Mr. Melo's co-defendant; (2) Hollywood, Florida police officer Boris Millares; (3) Florida Highway Patrol Officer Joseph Mosca; (4) Sunrise, Florida Police Department Detective Eddie Marill; (5) North Miami Beach police officer Gregory Tamburo; (6) Pedro Reynolds, another co-defendant;[3] and (7) IRS Agent Carlos Torres.

A.     Mr. Melo's Knowledge of Money as Drug Proceeds

During the hearing on Mr. Melo's guilty plea, his counsel advised the court Mr. Melo knew the money he was carrying came from unlawful activity, but did not know that it was proceeds from drug sales. While the court advised Mr. Melo that the government would be required to prove he knew the money was the proceeds of narcotics sales, the AUSA did not indicate that the government would undertake such proof. Specifically, the exchange was as follows:

Counsel for Melo:  Your Honor, as I told [an AUSA] earlier, Mr. Melo did not know they were narcotics proceeds, but he did know they were from some unlawful activity.

---

[3]Mr. Reynolds was called as a witness at the first of two sentencing hearings for Mr. Melo, on February 24, 2006, however, the hearing was stopped because Mr. Reynolds needed an interpreter, and none was in attendance. When the sentencing hearing reconvened on February 27, 2006, Mr. Reynolds was not called as a witness. Thus the record includes no substantive testimony from Mr. Reynolds.

5

| | |
|---|---|
| The Court: | I think that's all the elements require, is that he knows it is from some unlawful activity. I don't think he has to know what specific unlawful activity, does he? |
| AUSA: | No. He just needs to know that it's an unlawful activity. |
| The Court: | Okay. That's fine, then. But other than that, you understand that that's what you're pleading guilty to? |
| Mr. Melo: | Yes, Your Honor. |
| The Court: | Okay. They are alleging that it was narcotics activity. They have to prove that it was an unlawful activity. You don't have to know which particular unlawful activity it was. Do you understand that? |
| Mr. Melo: | Yes, sir. |

(Plea Tr. at 19.)

As things developed at the subsequent sentencing hearing, the government did undertake to prove that Mr. Melo's sentence should be enhanced because he had knowledge that it was drug proceeds. The government presented testimony from Hollywood, Florida police officer Boris Millares. On January 28, 2002, Detective Millares watched an individual identified as Giraldo put a bag inside Mr. Melo's car while the car was stopped outside a Wal-Mart. When Mr. Melo drove away, Detective Millares followed him to his home, and there sought and received permission to go inside. While Detective Millares was speaking with Mr. Melo inside his house, Highway Patrolman Joseph Mosca arrived on the scene with a

6

dog trained to alert to the presence of narcotics. The dog alerted to the exterior of Mr. Melo's vehicle. Agents searched the vehicle and retrieved a bag containing approximately $125,280.

Detective Millares testified that he was interviewing Mr. Melo inside the Melo home at the time that the drug dog alerted on the money found in his car. However, in their discussions Detective Millares explained to Mr. Melo that "[t]he fact that the dog had hit on the vehicle led us to believe that that was contraband, that there was illegal proceeds, money from illegal proceeds inside the vehicle." (Tr. of Sentencing Proceedings Before the Hon. Jose E. Martinez, United States District Judge, Feb. 24, 2006 ("Sentencing Tr. I") at 24.)

Detective Millares also testified that while he was in the Melo home that day, he presented Mr. Melo with a form entitled Affidavit and Stipulation Under the Florida Contraband Forfeiture Act. Mr. Melo signed the form, thereby acknowledging that the seized currency was contraband, but disclaiming ownership of it. He initialed a page of the form that recited the definition of "contraband article" under the Florida Contraband Forfeiture Act. The definition listed seven types of property that constitute contraband under the statute, the first of which was any controlled substance or currency used as proceeds for a controlled

7

substance.[4]  As set forth above, this interaction between Detective Millares and Mr. Melo happened on January 28, 2002, in the conspiracy that was, according to the indictment, ongoing until August 26, 2003.

     B.     The Amount of Funds Attributable to Mr. Melo for the August 26, 2003 Transaction[5]

At the sentencing hearing, the government also presented evidence specifically about the amount of money attributable to the August 26, 2003 transaction.  The only such evidence came from the testimony of Detective Eddie Marill who testified that, in his undercover capacity, he was contacted by a Colombian money broker named Juan Carlos Peralta.  Mr. Peralta told Detective Marill that he "had $800,000 in the Miami area that needed to be laundered back to Colombia for him."  (Sentencing Tr. I at 49.)  A short time later, a woman called Detective Marill and told him she had papers ready for a delivery of $200,000.  A man later determined to be Mr. Melo came to the telephone.  Detective Marill told

---

[4]The first of seven items delineated on the form as contraband was "[a]ny controlled substance as defined in chapter 893 or any substance, device, paraphernalia, or currency or other means of exchange that was used, was attempted to be used, or was intended to be used in violation of any provision of chapter 893."  Fla. Stat. § 932.701(2)(a)(1).

[5]The government also proffered evidence at the sentencing hearing showing that Mr. Melo participated in laundering transactions on September 24, 2002, November 8, 2002, and March 26, 2003, involving $60,000, $199,120, and $40,000, respectively.  (Tr. of Proceedings Held Befrore [sic] the Honorable Julio [sic] Maartinez [sic], a United States District Court, [sic] Judge ("Sentencing Tr. II") at 11.)  These amounts are not disputed by Mr. Melo, and therefore they will not be part of this discussion.

8

Mr. Melo that he expected a delivery of $800,000. Mr. Melo responded that he only had $200,000 "at that time" and there was no discussion of any larger amount of money to come later. (Id. at 50-51.) Detective Marill and Mr. Melo arranged for the delivery, and there was, in fact, $200,000 delivered and ultimately seized.

Upon hearing the testimony offered during the two days of the sentencing hearing, the district court calculated Mr. Melo's base offense level at 8 with a 16-level enhancement pursuant to §§ 2S1.1(a)(2) & 2B1.1(b)(1)(I).[6] The court arrived at the 16-level enhancement based on its finding that the intended loss from the conspiracy, including the additional $600,000 which had been mentioned, but not delivered in the August 26, 2003 transaction, was approximately $1,400,000.[7] The court added a 2-level enhancement pursuant to § 2S1.1(b)(2)(B) because the conviction was a violation of 18 U.S.C. §1956. The court also added a 6-level enhancement pursuant to §§ 2S1.1(b)(1)(A) & 2S1.1(b)(1)(B)(i) because it found that Mr. Melo knew the money he conspired to launder represented proceeds of a controlled substance. The district court declined

---

[6]Unless otherwise specified, section numbers in this opinion refer to the United States Sentencing Guidelines, based on the 2005 Sentencing Guidelines Manual.

[7](Sentencing Tr. II at 57.) 18 U.S.C. § 1956(h) provides that anyone who conspires to launder money is subject to the same penalties as one who commits the substantive offense of money laundering. U.S.S.G. § 2S1.1(a)(2) sets the base offense level at "8 plus the number of offense levels from the table in § 2B1.1 . . . corresponding to the value of the laundered funds . . . ." Finally, § 2B1.1(b)(1)(I) states that the court should add 16 levels if the value of the laundered funds amounted to more than $1,000,000.

to follow the PSR's recommendation to apply a 4-level increase pursuant to § 3B1.1(a), based upon the court's finding that the government had not established that Mr. Melo was an organizer or leader of the conspiracy. The court also denied Mr. Melo any reduction in the guideline calculation for acceptance of responsibility due to Mr. Melo's objections to some of the factual findings set forth in the PSR. The district court found that Mr. Melo had not accepted responsibility for his crime, and therefore any reduction pursuant to § 3E1.1 was not appropriate. Mr. Melo did not request, and the district court did not grant, a reduction on the ground that his crime was a conspiracy offense pursuant to § 2X1.1(b)(2).[8] The district court's calculations resulted in a guideline range of 188 to 235 months imprisonment, and the court sentenced Mr. Melo orally to 180 months.[9]

---

[8] That guideline provides that if the defendant's offense is a conspiracy, "decrease by 3 levels, unless the defendant or a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense or the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or interruption by some similar event beyond their control." U.S.S.G. § 2X1.1(b)(2).

[9] The written sentence reflects a term of 188 months imprisonment, which conflicts with the oral pronouncement of 180 months reflected in the sentencing transcript. (Sentencing Tr. II at 77.) "When a sentence pronounced orally and unambiguously conflicts with the written order of judgment, the oral pronouncement governs." United States v. Bates, 213 F.3d 1336, 1340 (11th Cir. 2000). However, we suspect that the 180 month sentence reflected in the sentencing transcript may have resulted from an error in transcription, or a simple slip of the tongue by the court, because 180 months is lower than the applicable guideline range, and the district court expressly noted that it did not find sufficient reason to "go outside" the guideline range. (Sentencing Tr. II at 76.) In any event, we need not ask the district court to resolve this issue because we vacate Mr. Melo's sentence on other grounds, and the district court will have the opportunity to restate his sentence.

10

Mr. Melo appeals on various grounds. First, he contends that the district court clearly erred in finding him responsible for an amount of loss exceeding $1,000,000 based on unreliable hearsay testimony without a finding of credibility. He argues that if this Court upholds the district court's calculation on amount of loss, the district court plainly erred when it did not reduce his offense level pursuant to § 2X1.1(b)(2), because he was convicted of conspiracy and had not completed the acts necessary to launder over $1,000,000. Second, Mr. Melo argues that the district court clearly erred in finding that he knew the laundered funds were drug proceeds. Third, Mr. Melo argues that the district court clearly erred in denying a reduction in his offense level based on acceptance of responsibility. Finally, he argues that the district court should not have applied the preponderance of the evidence standard to determine relevant conduct.[10]

## II. Discussion

We review the district court's findings of fact for clear error and its application of the Sentencing Guidelines to the facts *de novo*. United States v. Lozano, 490 F.3d 1317, 1321 (11th Cir. 2007). Clear error is a "highly deferential

---

[10]Mr. Melo emphasizes that his sentence was disproportionate to the sentences of his co-conspirators. Mr. Melo filed an unopposed Motion to Supplement [the] Record on Appeal to demonstrate that none of his co-conspirators received a sentence comparable to his. We grant the Motion and have reviewed Mr. Melo's supplemental materials, but the materials do not affect our decision. See infra at 21 (citing United States v. Chotas, 968 F.2d 1193, 1198 (11th Cir. 1992)).

11

standard," id. at 1322, and we find clear error only if "we are left with a definite and firm conviction that a mistake has been committed." United States v. Crawford, 407 F.3d 1174, 1177 (11th Cir. 2005) (citation and internal quotations omitted).

A.     Amount of Loss Calculation

The U.S. Sentencing Guidelines provide that a defendant is responsible for the greater of the actual or the intended pecuniary loss resulting from his crime. § 2B1.1 cmt n.3(A). To calculate the amount of loss attributable to a conspiracy defendant, the district court "first determine[s] the scope of criminal activity the defendant agreed to jointly undertake, and then consider[s] all reasonably foreseeable acts and omissions of others in the jointly undertaken criminal activity." United States v. McCrimmon, 362 F.3d 725, 731 (11th Cir. 2004) (citation and internal quotations omitted).[11]  The burden is on the government to support the amount of loss attributable to a defendant with "reliable and specific evidence."  See United States v. Lawrence, 47 F.3d 1559, 1566 (11th Cir. 1995) (describing the government's burden under a preponderance standard); United

_____

[11]In its response brief, the United States stated the standard for loss calculation based in part on two Fifth Circuit cases it erroneously attributed to the Eleventh Circuit, United States v. Tansley, 986 F.2d 880, 884 (5th Cir. 1993), and United States v. Fuller, 974 F.2d 1474, 1484 (5th Cir. 1992).  (See Br. for the United States 28.)  Those cases may serve as persuasive authority, but do not carry the same weight as a decision of this Court.

12

States v. Medina, 485 F.3d 1291, 1304 (11th Cir. 2007) (citation and internal quotations omitted) (stating the burden in the context of a crime involving fraud); United States v. Renick, 273 F.3d 1009, 1025 (11th Cir. 2001) (citation and internal quotations omitted) (same).

In essence, the evidence supporting the district court's finding that Mr. Melo was responsible for a total of $800,000 from the August 26, 2003 incident consisted of three words and three words only: "at that time." Mr. Peralta provided the only reference to $800,000 when he told Detective Marill to expect a call about an $800,000 delivery. When Mr. Melo contacted Detective Marill about a delivery, Detective Marill asked him about the $800,000 figure in an attempt to corroborate it, but Mr. Melo responded that he only had $200,000 "at that time." (Sentencing Tr. I at 50.) Authorities recovered only $200,000 from the transaction, and Mr. Melo was arrested a short time later.

Even under the deferential clear error standard of review, this evidence is not sufficient to establish that Mr. Melo was likely responsible for the additional $600,000. Mr. Melo did not mention or otherwise indicate any intent or capacity to deliver $800,000. Rather, he explained that "at that time" he had only $200,000. One could reasonably conclude from the phrase that Mr. Melo might deliver additional funds at some time in the future, but it would require impermissible

13

speculation to infer that "$200,000 at that time" in response to an inquiry about $800,000 acknowledged an additional $600,000 to be laundered in that transaction. See Renick, 273 F.3d at 1026 ("'[T]he district court must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines . . . .'" (quoting United States v. Dominguez, 109 F.3d 675, 676 (11th Cir. 1997))).  Nothing else aside from the phone call's temporal proximity to the conversation between Mr. Peralta and Detective Marill connects Mr. Melo to the claimed amount of $800,000.

The government bears the burden to show by a preponderance of the evidence that Mr. Melo was responsible for an amount over $1,000,000, and it did not present reliable and specific evidence sufficient to meet that standard.  See Lawrence, 47 F.3d at 1566.  Thus, the district court clearly erred in holding Mr. Melo responsible for an aggregate loss exceeding $1,000,000 because the evidence did not prove that he was responsible for $800,000 from the August 26, 2003 transaction.[12]  The total amount of loss when combined with the amounts from Mr.

_____

[12]This Court recently stated that a district court's error in loss calculation is harmless error if the district court would have imposed the same sentence regardless of the Sentencing Guidelines' recommendations on the amount of loss.  United States v. Tampas, 493 F.3d 1291, 1305 (11th Cir. 2007).  We cannot say the error here was harmless.  Because we have concluded that the proper calculation of the amount of loss attributable to Mr. Melo should have resulted in a 14-level increase rather than a 16-level increase under the Guidelines, the district court would probably have imposed a shorter sentence.  The district court stated that it would have imposed approximately the same sentence even if it had granted Mr. Melo a 3-level reduction for *acceptance of responsibility*, but it assumed the same amount of loss.  (Sentencing Tr. II at

14

Melo's other conspiracy transactions equals more than $400,000 but less than $1,000,000, so Mr. Melo's crime warrants a 14-level increase rather than a 16-level increase under § 2B1.1(b).

Because we conclude that the evidence was insufficient to establish that Mr. Melo was responsible for an amount of loss over $1,000,000, we need not determine whether the district court improperly based its factual finding on Mr. Peralta's hearsay statements. See United States v. Baker, 432 F.3d 1189, 1253-54 (11th Cir. 2005) (stating that a sentencing court may consider hearsay evidence "provided [it] has sufficient indicia of reliability, the court makes explicit findings of fact as to credibility, and the defendant has an opportunity to rebut the evidence"). Neither do we consider whether the district court plainly erred in denying Mr. Melo a reduction under § 2X1.1(b)(2) for the offense of conspiracy to launder more than $1,000,000. The record unambiguously shows that Mr. Melo committed the necessary acts to complete the money laundering transaction with respect to all of the laundered funds except the additional $600,000 attributed to him by the district court from the August 2003 transaction. Because the remaining amounts of money attributed to Mr. Melo related to completed transactions, he

77-78.)

15

would not be entitled to a § 2X1.1(b)(2) reduction for the offense of conspiracy to launder between $400,000 and $1,000,000.

B.     Knowledge of Illegal Narcotics Proceeds

The district court did not clearly err in finding that Mr. Melo knew that the laundered funds were proceeds of illegal narcotics transactions. Importantly, it found that Mr. Melo was on notice early in the conspiracy that drugs were involved because a dog trained to alert to narcotics alerted to Mr. Melo's car, and officers subsequently found and seized money from the car. To prove Mr. Melo's knowledge, the court relied in part on the forfeiture waiver he signed acknowledging the money was contraband. Although the waiver did not definitively state that the funds were proceeds from drugs, the district court could reasonably find that Mr. Melo would know that dogs do not alert to currency representing proceeds derived from any of the other crimes listed on the waiver, such as gambling. After he signed the forfeiture waiver, Mr. Melo continued to participate in the conspiracy for over a year until his arrest following the August 26, 2003 incident. The court also heard testimony from co-conspirator Ivan Tabares about facts that led Mr. Tabares to believe the money was drug proceeds, such as the method of delivery and the use of small bills. (Sentencing

16

Tr. I at 12.) The district court might reasonably have found that Mr. Melo, a former cocaine user, arrived at the same understanding as Mr. Tabares.

Given the circumstantial nature of the evidence as to Mr. Melo's knowledge, we do not think his challenge to that evidence frivolous. But, deferring to the district court to the extent that is proper under the clear error standard, we uphold the district court's finding.

C.      Acceptance of Responsibility

Upon resentencing, the district court may wish to revisit the question of whether § 3E1.1 entitles Mr. Melo to a 3-level acceptance of responsibility reduction. The PSR provided that the government agreed to recommend the acceptance of responsibility reduction "conditioned upon the defendant making a full and complete disclosure to the probation office regarding the offense." (PSR ¶ 4.) Mr. Melo provided a written statement accepting responsibility and expressing remorse. (Id. ¶ 31.) At sentencing, the district court made the following statement regarding acceptance of responsibility:

> He was granted acceptance from responsibility, I don't see how he can and argue about every little point. How does that work that he accepts responsibility, I did all of this, but I really didn't do it. I [sic] wasn't narcotics and it wasn't over a million dollars, and it wasn't this and it wasn't that, I have found that it was over a million, I have found that he did know that it was a controlled substance, he denied both of those things so I am taking away the acceptance of responsibility. I don't believe he has accepted responsibility.

17

(Sentencing Tr. II at 45-46.) The district court noted that the arguments Mr. Melo raised at sentencing took a significant amount of time, and may have lasted longer than a trial on these issues. (Id. at 54.)

Even where a defendant pleads guilty, he is not entitled to a reduction for acceptance of responsibility if he acts in a way inconsistent with acceptance of responsibility, U.S.S.G. § 3E1.1 cmt n.3, for example, when he "falsely denies, or frivolously contests, relevant conduct that the court determines to be true." Id. cmt n.1(a); see also United States v. Smith, 127 F.3d 987, 989 (11th Cir. 1997) ("[F]rivolous legal challenges could suggest to the district court that the defendant has not accepted responsibility for his conduct . . . a district court may consider the nature of such challenges along with the other circumstances in the case when determining whether a defendant should receive a sentence reduction for acceptance of responsibility."). The comments to § 3E1.1 provide that the sentencing judge's decision is entitled to great deference on review. Id. cmt n.5. We have also stated that "'[a] district court's determination that a defendant is not entitled to acceptance of responsibility will not be set aside unless the facts in the record clearly establish that a defendant has accepted personal responsibility.'" United States v. Amedeo, 370 F.3d 1305, 1320-21 (11th Cir. 2004) (quoting United States v. Sawyer, 180 F.3d 1319, 1323 (11th Cir. 1999)).

18

We cannot say that the district court clearly erred in refusing to award acceptance of responsibility under this standard. However, we note that the district court based its decision to deny the reduction on Mr. Melo's challenges to the PSR. Mr. Melo challenged the PSR on a total of four grounds. The district court resolved one of these grounds in Mr. Melo's favor when it found that the government had not established that Mr. Melo was a leader or organizer of the conspiracy. We now rule in his favor on another ground, namely that he was not responsible for an amount of loss exceeding $1,000,000.

Of Mr. Melo's remaining two challenges to the PSR, one was a request for a downward departure based on his Category V criminal history, which he argued "over represents the seriousness of the defendant's criminal history or the likelihood the defendant will commit further crimes." (Addendum to PSR 3.) The district court stated that it "[did] not believe there [was] sufficient reason to justify going outside the guideline range" (Sentencing Tr. II at 76), but Mr. Melo devoted no time to this objection at sentencing.

Finally, Mr. Melo objected to the PSR's 6-level enhancement under §§ 2S1.1(b)(1)(A) & 2S1.1(b)(1)(B)(i) (and argued that he did not know or believe that the funds he conspired to launder were proceeds of narcotics. We have concluded that the district court did not clearly err when it applied this

19

enhancement. However, we do not say Mr. Melo's argument was frivolous. This is particularly so given that Mr. Melo's argument at sentencing (that he did not realize the funds he was handling were drug proceeds) was completely consistent with the statement made by him, and accepted by the court and the government at his plea hearing. (Plea Tr. at 19.)

In conclusion, the district court did not clearly err in denying Mr. Melo acceptance of responsibility credit. However, the court may view the facts differently at resentencing, now that another of the issues which Mr. Melo contested has been decided in his favor. If so, it is free to grant Mr. Melo this reduction.

D.     Preponderance Standard

Finally, we reject Mr. Melo's argument that the district court erred by finding facts establishing relevant conduct according to a preponderance of the evidence standard. Courts routinely hold that under the advisory guidelines system, a judge may find facts by a preponderance of the evidence during sentencing, consistent with the Sixth Amendment and the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005). E.g., United States v. Smith, 480 F.3d 1277, 1281 (11th Cir. 2007); United States v. Stevens, 487 F.3d 232, 245-46 (5th Cir. 2007); United States v. Lawson, 494 F.3d 1046, 1057-58

(D.C. Cir. 2007); <u>United States v. Gallimore</u>, 491 F.3d 871, 877 (8th Cir. 2007).

Additionally, that Mr. Melo was sentenced disproportionately to his co-conspirators does not itself present a basis for reversal, particularly where Mr. Melo's criminal history contributed to the length of his sentence. <u>See</u> <u>United States v. Chotas</u>, 968 F.2d 1193, 1198 (11th Cir. 1992) ("[T]o adjust the sentence of a co-defendant in order to cure an apparently unjustified disparity between defendants in an individual case will simply create another, wholly unwarranted disparity between the defendant receiving the adjustment and all similar offenders in other cases.").

## III. Conclusion

For the foregoing reasons, we vacate Mr. Melo's sentence and remand to the district court to resentence him in accordance with this opinion. In calculating Mr. Melo's guideline range, the district court is directed to reduce Mr. Melo's offense level by two levels because the evidence shows that he was responsible for an amount of money greater than $400,000 but less than $1,000,000. The district court may, in its discretion, also grant Mr. Melo a reduction for acceptance of responsibility.

**VACATED AND REMANDED.**

21